[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 26, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-10176

_____

D. C. Docket No. 06-00813-CV-T-30-TBM

PEARLIE MCCULLOUGH,
as grandmother and personal representative of the
estate of her grandson, Marquell McCullough, deceased,

Plaintiff-Appellee,

versus

DAVID ANTOLINI,
Deputy Sheriff, in his individual capacity,
NELSON DELEON,
Deputy Sheriff, in his individual capacity,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(February 26, 2009)

Before HULL, MARCUS and KRAVITCH, Circuit Judges.

MARCUS, Circuit Judge:

In this civil rights case, Pinellas County sheriff's deputies David Antolini and Nelson DeLeon appeal from the district court's denial of their motion for summary judgment on the basis of qualified immunity. The sheriff's deputies used deadly force against Marquell McCullough in a rapidly unfolding scenario early in the morning hours of May 2, 2004. The facts, taken in the light most favorable to McCullough, established that he disobeyed a police command and refused to pull his truck over, led the police on a high speed chase, and then after finally pulling over, refused to show his hands or respond to the deputy sheriff's orders and drove his truck in the direction of a sheriff's deputy standing nearby.

After thorough review, we conclude that the sheriff's deputies are entitled to qualified immunity; their actions did not constitute excessive force under the Fourth Amendment. Accordingly, we reverse the denial of summary judgment and remand for further proceedings consistent with this opinion.

I.

In conducting de novo review of the district court's resolution of a summary judgment motion based on qualified immunity, we resolve all issues of material fact in favor of the plaintiff. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002). As we noted in Lee,

2

we approach the facts from the plaintiff's perspective because "[t]he issues appealed here concern not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of clearly established law." Sheth v. Webster, 145 F.3d 1231, 1236 (11th Cir.1998). As this Court has repeatedly stressed, the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case. Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000). Nevertheless, for summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the plaintiff. See Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002).

284 F.3d at 1190. Because the plaintiff in this action is deceased and there is no complete witness testimony, we necessarily rely on the facts presented by the defendants, but where there is a discrepancy between the statements of the defendants, we have resolved the dispute by using only those statements most favorable to the plaintiff. See generally Skrtich, 280 F.3d at 1299 ("On review of a district court's denial of summary judgment, the Court considers the pleadings, depositions, affidavits, answers to interrogatories and admissions together with the affidavits if any... in the light most favorable to the non-moving party.").

This tragic story begins at approximately 1:00 a.m. on May 2, 2004, when Pinellas County sheriff's deputy John Syers, Jr. received a report about individuals dealing narcotics at the La Quinta Inn located on 34th Street North in Pinellas County. Syers pulled his unmarked police car into the La Quinta Inn parking lot

3

and observed what he believed to be a drug transaction between two individuals. He pursued and stopped one of the individuals, Donald Mohyla, and then returned to the parking lot. When he re-entered the parking lot, he saw the man whom he believed to be the other individual involved in the drug transaction, Marquell McCullough. As Syers approached McCullough, McCullough got into his white pickup truck and drove out of the parking lot. Syers observed that the tint on the truck's windows was too dark, in violation of Florida law.

He radioed the vehicle's tag number as well as his suspicion of drug activity to deputies Antolini and DeLeon and told them they had probable cause to conduct a traffic stop for excessive window tint. Antolini followed the truck, and pulled his police car behind it as it stopped at a traffic light at the intersection of 38th Ave. North and 34th St. North. DeLeon pulled his police cruiser behind the police cruiser driven by Antolini and the truck driven by McCullough. When the light turned green, McCullough accelerated his truck heading south. Both Antolini and DeLeon then activated their emergency lights and sirens and followed the truck. The truck did not pull over, instead continuing to accelerate to approximately sixty miles per hour. After the truck went through the intersection of 22nd Ave. North, it pulled into a shopping center parking lot. Antolini followed the truck, and DeLeon in turn followed but was further behind at this point.

4

The ground was wet from a previous rain, and shortly after McCullough drove into the parking lot, his truck fishtailed and spun around up to 270 degrees. According to testimony from a taxi cab driver driving near the scene, Thomas Bowen,[1] "it looked like [McCullough] tried to make a U-Turn and leave the parking lot." According to deputy Antolini, McCullough's truck then came to a stop at approximately a forty-five degree angle to, and a few feet away from Antolini's police car which then stopped. Antolini exited his vehicle, drew his firearm and walked to the front of his police car. Antolini pointed his firearm at the driver of the truck and yelled at McCullough, directing him to show his hands. In his affidavit in support of summary judgment, Antolini avers "I was able to make eye contact with the driver of the truck." The driver did not show his hands or respond to the officer's command.

While this was happening, deputy DeLeon drove into the parking lot. According to his statement to investigators, "deputy DeLeon was coming in a little fast as the parking lot was wet from a recent rain." According to witness Bowen, it looked like DeLeon (along with Antolini) were trying to box McCullough in. DeLeon was passing the right side of Antolini's car, applied his brakes, skidded past the passenger side of Antolini's car, and struck McCullough's truck. The

---

[1]Bowen was heading northbound on 34th Street at the time. He later slowed down and came to rest on the edge of the parking lot.

force of the collision jammed the driver's side door of deputy DeLeon's cruiser shut, and left the cruiser and the truck inches apart.

DeLeon said that he yelled to Antolini that he was "stuck," and Antolini reported hearing DeLeon yell something. Notably, at this point, both Antolini and DeLeon heard McCullough's truck's engine revving, and DeLeon thought he heard its tires spinning. DeLeon drew his firearm and fired one shot through his closed driver's-side window at the truck's windshield. Antolini then fired three shots towards the truck's windshield. Antolini was unable to determine whether these shots struck McCullough.

At this point, the truck went into reverse, and spun its tires. Antolini said he saw the truck back away from DeLeon's cruiser and its front wheels swing in his direction. He then fired another round at the truck's windshield and jumped on the hood of his cruiser in order to avoid being struck by the moving vehicle. McCullough drove the truck towards deputy Antolini and it struck Antolini's police cruiser in the front passenger corner or front right bumper. The damage to Antolini's car was limited to some paint transfer from the white truck to the right front bumper of Antolini's cruiser, suggesting that the truck was moving slowly.

The truck then kept moving westward, continuing to "mov[e] out of the boxed-in situation that the officers had him in"[2] and away from Antolini and DeLeon. According to DeLeon, the truck was then moving at a slow speed across the parking lot toward the taxi cab now parked at the parking lot's exit, and Antolini and DeLeon were able to move alongside the truck and stay at least even with the passenger column of the truck. As the truck rolled away, Antolini and DeLeon followed the truck on foot, both along the passenger side, and each fired more rounds at the passenger side of the vehicle. DeLeon said that he fired more rounds because he heard gun shots and did not know who was firing them. Antolini told investigators that he remembered telling DeLeon to "watch your crossfire," but said he was not sure where DeLeon was standing at the time.

The truck finally rolled to a stop when it entered a shallow ditch at the edge of the parking lot, before the sidewalk. Antolini and DeLeon reloaded and approached the front of the truck with weapons pointed at the passenger side. Antolini called to report the incident, and McCullough was pronounced dead at

---

[2]This observation comes from Bowen, who at that point purposefully stopped his cab at the exit of the parking lot so that "if the truck was coming out, it would probably strike my vehicle." Bowen, a former police officer, stated that he did this to help the police.

the scene by arriving paramedics. The entire incident took place over a very short period of time.[3]

According to the medical examiner's report, McCullough died of multiple gunshot wounds. Nine bullets struck McCullough in total, with a shot traveling back to front and striking him in the head after ricocheting off the seatbelt being the fatal shot. A Pinellas County Sheriff's Office detective assigned to the case further found that the deputies fired a total of fifteen shots at McCullough; Antolini shot nine times and DeLeon six. The detective also determined that all of the shells recovered at the scene were from the deputies' guns and that McCullough was unarmed.

On May 2, 2006, appellee Pearlie McCullough, on behalf of the estate of her grandson Marquell Deontae McCullough, filed this two-count § 1983 civil rights complaint against deputies Antolini and DeLeon, and the Pinellas County Sheriff's Office in the United States District Court for the Middle District of Florida. The claim against Antolini and DeLeon in their individual capacities alleged among

---

[3]Indeed, both parties agreed at oral argument that the incident, from the time of the initial collision with DeLeon's cruiser until McCullough's truck rolled to its ultimate stop near the exit, took place in approximately twenty seconds.

8

other things that the deputies seized McCullough with excessive (and deadly) force in violation of the Fourth Amendment.[4]

On September 27, 2007, Antolini and DeLeon moved for summary judgment on the ground of qualified immunity. Soon thereafter, the district court denied the motion concluding that the officers were not entitled to qualified immunity. This timely interlocutory appeal followed.

## II.

The only issue before us is whether the sheriff's deputies are entitled to qualified immunity on the Fourth Amendment claim that they wrongfully used deadly force. We review the district court's disposition of a summary judgment motion based on qualified immunity de novo. Lee, 284 F.3d at 1190. Summary judgment is appropriate if "the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (internal quotations omitted). We add that the mere existence of a factual dispute does not preclude summary judgment for the defendants on the basis of qualified immunity. McDaniel v. Woodard, 886 F.2d 311, 313 (11th Cir. 1989).

---

[4]Count Two, which is not now before us, sued Sheriff Jim Coats in his official and personal capacities, alleging that the deputies committed the tort of wrongful death under Florida law.

In order to overcome a summary judgment motion on the basis of qualified immunity, the facts in dispute must raise a genuine issue of fact material to the determination of the underlying issue -- here whether police officers used excessive force.  See, e.g., Lee, 284 F.3d at 1190; Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir. 1998).

As we have often observed, "[q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lee, 284 F.3d at 1193-94 (internal quotations omitted).  The purpose of qualified immunity is to allow officials to carry out discretionary duties without the chilling fear of personal liability or harrassive litigation, Anderson v. Creighton, 483 U.S. 635, 638-39 (1987), "protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee, 284 F.3d at 1194 (internal citation omitted).  In order to receive qualified immunity, an official must first establish that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Id. (internal quotations omitted).  If the official was acting within the scope of his discretionary authority -- and it is undisputed that officers Antolini and DeLeon were acting within their discretionary authority -- the burden

10

then shifts to the plaintiff to show that the grant of qualified immunity is inappropriate. Id.

The Supreme Court recently reaffirmed the long-established standard for qualified immunity in Pearson v. Callahan, 555 U.S. _, No. 07-751 (Jan. 21, 2009). "Qualified immunity balances two important interests, the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." See id., slip op. at 6. Under Pearson, we are obliged to grant qualified immunity unless the plaintiff can demonstrate: first, that the facts viewed in the light most favorable to the plaintiff establish a constitutional violation by the officers, and, second, that it was clearly established at the time of the incident that the actions of the defendant were unconstitutional. See id., slip op. at 4-5, 10. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Lee, 284 F.3d at 1194 (internal citation omitted). Moreover, under Pearson, the federal courts are no longer required to conduct this qualified immunity analysis in the order articulated by Saucier v. Katz, 533 U.S. 194 (2001); rather, we are "permitted to exercise [our] sound discretion" in deciding which prong of this inquiry to address first. Slip op. at 10.

11

In this case, we begin and end our analysis with whether the law enforcement officers violated McCullough's Fourth Amendment rights. We hold that they did not.

The complaint alleges, among other things, that deputies Antolini and DeLeon used excessive force in violation of the Fourth Amendment when they shot McCullough in his vehicle. A claim of excessive force is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989); Long v. Slaton, 508 F.3d 576, 580 (11th Cir. 2007). In determining the reasonableness of the force applied, we look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate. Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1778 (2007). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. And, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

12

This Court has explained the application of the constitutional reasonableness test in practice. In Lee, we wrote:

> The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest. In order to determine whether the amount of force used by a police officer was proper, a court must ask "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." The Supreme Court has held that "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Moreover, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."

Lee, 284 F.3d at 1197 (internal citations omitted). In Lee we reviewed an excessive force claim against an officer and we stated that to determine whether a constitutional violation occurred, we measure the level of force used against 1) the severity of the crime, 2) the immediacy of the threat posed by the suspect, and 3) whether the suspect sought to evade or resist arrest. Id. at 1197-98 (citing Graham, 490 U.S. at 397).

In Vaughan v. Cox, 343 F.3d 1323 (11th. Cir. 2003), we reviewed another excessive force claim and we recited some of the conditions attendant to the

13

lawful use of deadly force.  We observed that a police officer may use  deadly

force where the officer,

> (1) "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" or "that he has committed a crime involving the infliction or threatened infliction of serious physical harm"; (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly force, if feasible.

Vaughan, 343 F.3d at 1329-30 (quoting Tennessee v. Garner, 471 U.S. 1, 11-12

(1985)).

The constitutional test for excessive force is necessarily fact specific.

"Because 'the test of reasonableness under the Fourth Amendment is not capable

of precise definition or mechanical application,' we must 'slosh our way through

the fact bound morass of reasonableness.'"  Long, 508 F.3d at 580.  We have had

occasion to review many excessive force claims against officers in the context of

qualified immunity determinations where the decedent was driving an automobile

at the time deadly force was used.  In some of the cases, we have found that the

officers were not entitled to qualified immunity.  In others, we have awarded

qualified immunity.  We have, however, consistently upheld an officer's use of

force and granted qualified immunity in cases where the decedent used or

14

threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force.

In Pace v. Capobianco, 283 F.3d 1275 (11th Cir. 2002), for example, a panel of this Court upheld the officer's use of deadly force against a fleeing suspect who, a few seconds before the shooting, had been driving hazardously and had swerved his car at police officers. Id. at 1277, 1282. We found the use of force constitutional because "[the decedent] would have appeared to reasonable police officers to have been gravely dangerous" at the time of the shooting, based on his aggressive and reckless driving as well as his failure to heed police warning. Id. at 1292.

In Robinson v. Arrugueta, 415 F.3d 1252 (11th Cir. 2005), a panel of this Court, relying on similar reasoning, granted qualified immunity to an officer who used deadly force when a suspect slowly -- at one or two miles per hour -- drove a vehicle forward toward the officer who was standing between the suspect's vehicle and a parked car. We said that the use of deadly force was reasonable because "[e]ven if in hindsight the facts show that Arrugueta perhaps could have escaped unharmed . . . a reasonable officer could have perceived that [decedent] was using the Escort as a deadly weapon . . . [and thus] Arrugueta had probable cause to believe that [he] posed a threat of serious physical harm." Id. at 1256.

15

Finally, in Long v. Slaton, 508 F.3d 576 (2007), a panel of this Court found no excessive force violation and granted qualified immunity to officers who used deadly force against a mentally unstable person who had avoided police capture, stole a marked police cruiser, and was attempting to drive the police cruiser toward the road. Id. at 578-79. We held that "[a]lthough at the point of the shooting Long had not yet used the police cruiser as a deadly weapon, Long's unstable frame of mind, energetic evasion of the deputy's physical control, Long's criminal act of stealing a police cruiser, and Long's starting to drive – even after being warned of deadly force – to a public road gave the deputy reason to believe Long was dangerous." Id. at 581-82 (internal citation omitted).

The sad case now before us is similar in key respects to these cases. This case unfolded very rapidly and under less than ideal conditions. The facts, viewed in the light most favorable to plaintiff, plainly show at least this much:

1.  Deputy Syers transmitted information to deputies Antolini and DeLeon about McCullough's suspected participation in a drug transaction;

2.  McCullough failed to pull his truck over when deputies Antolini and DeLeon turned on their emergency lights and sirens at approximately 1:30 a.m;

3.  McCullough instead accelerated to approximately sixty miles per hour not long after it had rained and cut across two lanes of traffic;

16

4. McCullough then abruptly pulled his truck into a parking lot, and his high speed and the wet conditions caused his vehicle to fishtail so that he ended up only a few feet away from Antolini's police car;

5. Antolini pointed his firearm at McCullough and asked him to show his hands. McCullough failed to do so or, indeed, to reply in any manner;

6. After DeLeon's cruiser collided with McCullough's truck, and while DeLeon was pinned inside just inches from McCullough, McCullough revved his engine and DeLeon heard McCullough spin his wheels;

7. Moments later, McCullough backed up his truck, turned his wheels toward Antolini and drove the truck towards Antolini's cruiser. Antolini had to quickly jump onto the hood of his police cruiser in order to avoid being hit by McCullough's truck, and the truck struck Antolini's car at the front passenger corner or front right bumper;

8. McCullough then drove away toward a parked taxi cab and the exit of the parking lot leading to the street;

9. The entire incident, from the time of the initial collision with DeLeon's cruiser until McCullough's truck finally rolled to its ultimate stop near the exit of the parking lot, took place over a very short period of time.

In short, the sheriff's deputies used deadly force in a split-second situation where a suspect late at night refused to pull over, engaged in a high-speed chase,

17

and then, after pulling over, repeatedly refused to show his hands or respond to officers, revved his engine, and then drove his truck toward the deputy standing nearby in a parking lot.

As in Pace, Robinson, and Long, McCullough used his vehicle in a dangerous and aggressive manner which provided the officers with probable cause to believe that McCullough, while driving his truck, posed a threat of serious physical harm or death to the officers, or other passersby, especially in light of the speed with which the incident unfolded. Specifically, McCullough's initial attempts to evade police, his failure to heed police warning of the potential use of deadly force, his later attempt to drive a truck towards an officer on foot, and his still later apparent attempt to drive away from the officers toward the exit of the parking lot provided the officers with sufficient reason to believe the use of deadly force was necessary.

Thus, on the particular facts of this case, especially in light of the deference we afford the split-second police judgments in the field and our prior precedent in this difficult area, we are constrained to conclude that deputies Antolini and DeLeon had probable cause to believe that the suspect posed a direct threat of serious physical harm or death,  gave an adequate warning under the circumstances, and had powerful reason to believe that the use of deadly force was

necessary to prevent escape. Simply put, the force used against McCullough was not excessive under the Fourth Amendment and the officers were entitled to qualified immunity. Because we can discern no constitutional violation, we need not address whether the constitutional right at issue had been clearly established when the incident arose.

## III.

Accordingly, we reverse the district court's denial of the defendants' motion for summary judgment and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**