[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 10, 2010
JOHN LEY
CLERK

No. 09-15907
Non-Argument Calendar

_____

D. C. Docket No. 09-00154-CV-RBP

OTIS SIMS, III,

Plaintiff-Appellant,

versus

LESTER QUILLIAMS,
CITY OF RIVERSIDE, ALABAMA,
et al.,

Defendants,

GREGORY ALAN WALKER,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(May 10, 2010)

Before MARCUS, WILSON and FAY, Circuit Judges.

PER CURIAM:

Otis Sims, III appeals from the district court's grant of summary judgment on the basis of qualified immunity in favor of St. Clair County Deputy Gregory Alan Walker. Sims' complaint alleged, among other things, that his civil rights had been violated when Deputy Walker used excessive force by firing his gun at Sims -- resulting in a gunshot wound to Sims' hand -- as Sims was fleeing in his vehicle on the interstate during a high-speed chase. On appeal, Sims argues that: (1) the district court applied the wrong summary judgment standard in reviewing the facts and concluding that no genuine issue of material fact existed; and (2) the district court erred in holding that Deputy Walker is entitled to qualified immunity, on the grounds that Deputy Walker was not acting within his discretionary authority when the constitutional violation occurred, the facts alleged show that Deputy Walker's conduct violated Sims' constitutional rights, and the violated constitutional right was clearly established at the time of the violation. After thorough review, we affirm.

We review <u>de novo</u> the district court's resolution of a summary judgment motion based on qualified immunity. <u>McCullough v. Antolini</u>, 559 F.3d 1201, 1202 (11th Cir. 2009).

The relevant facts, derived in large part from the video and audio tapes from the police cruisers involved in the events in question, are these. On April 29, 2008,

Deputy Walker learned that the Pell City Police Department was in pursuit of a vehicle coming out of the nearby industrial park. As Deputy Walker was leaving a store parking lot, he saw the vehicle with a Pell City police officer in pursuit. With his siren and emergency lights activated, Deputy Walker entered the pursuit. Several minutes into the pursuit, the officers attempted to execute a rolling roadblock maneuver, but Sims rammed the police cruiser of Riverside Police Chief Lester Quilliams to continue his flight. Within the next twenty-two seconds, Officer Quilliams executed two other driving maneuvers to stop Sims' truck, the second of which sent Sims' pickup off the interstate. In the next five to six seconds, Deputy Walker pulled over, stopped, and exited his cruiser. In the next seven seconds, Walker approached Sims' pickup, observed Sims driving at him in reverse, stop, and then begin driving away, roughly towards the other officers who were on foot. During the next four seconds, Walker fired eight rounds at the rear passenger tire of Sims' truck, and then began to run back to his cruiser to continue the pursuit. These eight shots are the police conduct at issue in this appeal.

First, we are unpersuaded by Sims' claim that the district court erred by applying the wrong summary judgment standard and erroneously concluding that no genuine issue of material fact existed on the record. We have held that

> [w]e are required to view all facts and draw all reasonable inferences
> in favor of the non-moving party when reviewing a grant of summary

3

judgment. The Supreme Court recognized in <u>Scott v. Harris</u>, 550 U.S. 372, [378-81] (2007), that this typically means adopting the plaintiff's version of facts in a qualified immunity case. Nonetheless, in this case, as in <u>Harris</u>, we have the benefit of viewing two videotapes from the patrol cars involved in the pursuit. Thus, to the extent Appellant's version of the facts is clearly contradicted by the videotapes, such that no reasonable jury could believe it, we do not adopt his factual allegations.

<u>Beshers v. Harrison</u>, 495 F.3d 1260, 1262 (11th Cir. 2007) (citation omitted).

Here, as in <u>Beshers</u> and <u>Harris</u>, video and audio tapes exist depicting the events in question. Because the district court relied on the facts as it observed them in the tapes, it did not err by relying on these facts rather than on Sims' contradictory assertions. Accordingly, the district court did not apply the wrong summary judgment standard in reviewing the facts. Nor, as discussed below, did the district court err, based on the events depicted in the tapes, by concluding that no genuine issue of material fact existed as to the perceived danger Sims' vehicle posed to Deputy Walker and the other officers.

Indeed, having reviewed the tapes, we reject Sims' claim that the district court erred in granting qualified immunity to Deputy Walker. "Qualified immunity balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 129 S.Ct. 808, 815 (2009). To be eligible for

4

qualified immunity, the officers must demonstrate that they were acting in the scope of their discretionary authority. O'Rourke v. Hayes, 378 F.3d 1201, 1205 (11th Cir. 2004). "To determine whether an official was engaged in a discretionary function, [courts] consider whether the acts the official undertook are of a type that fell within the employee's job responsibilities." Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004) (quotation omitted). In applying this test, courts should look to the "general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004).

Once the officers have shown that they were acting within their discretionary authority, the courts are obliged to grant qualified immunity unless the plaintiff can demonstrate that: (1) the facts viewed in the light most favorable to the plaintiff establish a constitutional violation by the officers, and, (2) it was clearly established at the time of the incident that the actions of the defendant were unconstitutional. McCullough, 559 F.3d at 1205. Under Pearson, however, courts are no longer required to conduct this qualified immunity analysis in the order articulated by Saucier v. Katz, 533 U.S. 194 (2001); rather, we are "permitted to

exercise [our] sound discretion" in deciding which prong of this inquiry to address first. Id. (quoting Pearson, 129 S. Ct. at 818).

A claim of excessive force is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989); Long v. Slaton, 508 F.3d 576, 580 (11th Cir. 2007). In determining the reasonableness of the force applied, we look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate. McCullough, 559 F.3d at 1206 (citing Harris, 127 S. Ct. at 1778). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. And, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id. at 396-97.

As we observed in McCullough, we have "consistently upheld an officer's use of force and granted qualified immunity in cases where [a suspect] used or threatened to use his car as a weapon to endanger officers or civilians immediately

6

preceding the officer's use of deadly force." 559 F.3d at 1207. In Pace v. Capobianco, 283 F.3d 1275, 1277, 1282 (11th Cir. 2002), for example, we upheld an officer's use of deadly force against a fleeing suspect who, a few seconds before the shooting, had been driving hazardously and had swerved his car at police officers. We found the use of force constitutional because "[the suspect] would have appeared to reasonable police officers to have been gravely dangerous" at the time of the shooting, based on his aggressive and reckless driving as well as his failure to heed police warning. Id. at 1281. Similarly, in Robinson v. Arrugueta, 415 F.3d 1252, 1256 (11th Cir.2005), we upheld an officer's use of deadly force when a suspect slowly -- at one or two miles per hour -- drove a vehicle forward toward the officer who was standing between the suspect's vehicle and a parked car. We said that the use of deadly force was reasonable because "[e]ven if in hindsight the facts show that Arrugueta perhaps could have escaped unharmed . . . a reasonable officer could have perceived that [the suspect] was using the Escort as a deadly weapon . . . [and thus] Arrugueta had probable cause to believe that [he] posed a threat of serious physical harm." Id. And, in Long, 508 F.3d at 578-79, we upheld officers' use of deadly force against a mentally unstable person who had avoided police capture, stole a marked police cruiser, and was attempting to drive the police cruiser toward the road. We held that "[a]lthough at the point of the

7

shooting Long had not yet used the police cruiser as a deadly weapon, Long's unstable frame of mind, energetic evasion of the deputy's physical control, Long's criminal act of stealing a police cruiser, and Long's starting to drive -- even after being warned of deadly force -- to a public road gave the deputy reason to believe Long was dangerous." Id. at 581-82 (citation omitted). Relying on these cases, we held in McCullough that the sheriff's deputies' use of deadly force was constitutional, where a suspect late at night refused to pull over, engaged in a high-speed chase, and then, after pulling over, repeatedly refused to show his hands or respond to officers, revved his engine, and then drove his truck toward the deputy standing nearby in a parking lot. 559 F.3d at 1208.

As an initial matter, we are unpersuaded by Sims' claim that Deputy Walker was not acting within the scope of his discretionary authority at the time of the incident in question. As the record shows, Deputy Walker was a police officer involved in a high-speed pursuit of a suspect -- conduct that unquestionably is "of a type that fell within [Deputy Walker's] job responsibilities." Crosby, 394 F.3d at 1332 (quotation omitted).

We also disagree with Sims' claim that Deputy Walker's actions were not objectively reasonable. As the videos demonstrate, Deputy Walker had to make a split-second decision under tense, uncertain, and rapidly evolving circumstances.

Sims, although he had multiple opportunities to stop, chose on every occasion to recklessly disregard his safety, officers' safety, and the safety of innocent civilian motorists. Because Sims consistently acted with such disregard for the lives of others on every occasion during the pursuit, Deputy Walker had sufficient reason to believe that he would run down the officers who were on foot to enable his escape. Just prior, Sims swerved to avoid the rolling road block. Based on his prior conduct, Walker had reason to believe that Sims would swerve again to escape. Thus, as in Pace, Robinson, Long, and McCullough, Sims "used his vehicle in a dangerous and aggressive manner which provided [Deputy Walker] with probable cause to believe that [Sims], while driving his truck, posed a threat of serious physical harm or death to the officers, or other passersby, especially in light of the speed with which the incident unfolded." McCullough, 559 F.3d at 1208. Because Sims' culpable actions gave him sufficient reason to believe that Sims presented a significant risk of harm to the other officers, bystanders who might have been present, and other motorists, Deputy Walker's split-second decision to discharge his firearm was constitutionally reasonable.

Finally, since we conclude that Deputy Walker did not violate Sims' constitutional rights, we need not address whether it was clearly established at the time of the incident that the actions of the defendant were unconstitutional. See id.

9

at 1205 ("begin[ning] and end[ing] our analysis with whether the law enforcement officers violated McCullough's Fourth Amendment rights").

**AFFIRMED.**