[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-12444
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cv-00197-WS-M

BRENT JACOBY,

Plaintiff - Appellant,

versus

BALDWIN COUNTY,
SHERIFF MACK,
MAJOR BYRNE,
DR. SHERMAN,
NURSE WASDIN, et al.,

Defendants - Appellees,

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(December 31, 2014)

Before MARTIN, JILL PRYOR, and ANDERSON, Circuit Judges.

PER CURIAM:

Brent Jacoby, an Alabama pretrial detainee proceeding *pro se*, appeals the

district court's order granting summary judgment[1] on his claims under 42 U.S.C. §

1983 in favor of Baldwin County, Baldwin County Sheriff Huey Mack, Corporals

William Crull, Kent Carr, and Wallace McCall, and two members of the Baldwin

County Corrections Center ("BCCC") health staff, Dr. Charles Sherman and

Registered Nurse Carol Wasdin.[2]  After careful review, and for the reasons set

forth below, we affirm.

I.

In late October 2011, Mr. Jacoby arrived at BCCC to await trial.[3]  During

the intake process, Mr. Jacoby informed Nurse Wasdin, BCCC's Director of

Nursing, that he suffered from seizures and mental illness that required medication

for treatment.  He also indicated that he had suffered previously from suicidal

---

[1] The district court denied Mr. Jacoby's cross motion for summary judgment.

[2] The final named defendant, BCCC Commander Arthur Byrne, apparently died after Mr. Jacoby filed his notice of appeal.  *See* Suggestion of Death, *Jacoby v. Baldwin Cnty. et al.*, No. 1:12-CV-197 (S.D. Ala. Dec. 10, 2013) (ECF No. 93).  Although Federal Rule of Appellate Procedure 43(a)(1) permits a party's substitution in the event of death, the substitution must be requested in a motion to this Court.  Mr. Jacoby filed a motion for substitution in the district court, which the district court denied, directing Mr. Jacoby to file his motion in this Court.  Mr. Jacoby has not done so.  We therefore conclude that neither Commander Byrne nor any of his representatives remains a party to this appeal.  *See Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007) (requiring *pro se* litigants to conform to the Court's procedural rules).

[3] The facts that follow, unless otherwise indicated, are not in dispute.  *See McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009) (requiring courts to rely on all undisputed facts and otherwise take facts in the light most favorable to the nonmovant at the summary judgment phase).

2

thoughts and tendencies and stated that he had attempted suicide once in 2001 and again in 2005.  BCCC medical staff attempted to locate Mr. Jacoby's most current medical and pharmaceutical records.  Although they successfully located some of Mr. Jacoby's medical records, they were unable to locate records of the prescriptions Mr. Jacoby said he had at the pharmacies he disclosed to them.

In the final days of October, Mr. Jacoby completed several health services request forms, on which he indicated that he needed to see a mental health professional for counseling and medication for bipolar disorder.  BCCC medical staff scheduled a November 1, 2011 appointment for Mr. Jacoby to see Dr. Sherman, an internist who was BCCC's Medical Director.  At that appointment, Mr. Jacoby told Dr. Sherman about his seizures, and Dr. Sherman prescribed him a drug called Dilantin.[4]  Mr. Jacoby also talked about his history of mental illness but, because he did not present with any symptoms, Dr. Sherman did not prescribe psychiatric medication.

On November 9, 2011, Mr. Jacoby completed a health services request form asking that his anti-seizure medication be changed.  In response to this request, and after receiving Mr. Jacoby's medical records from the New York Department of

---

[4] Although Mr. Jacoby initially claimed Dr. Sherman's treatment of his seizures was deliberately indifferent, he does not assert this claim on appeal.

3

Corrections, Dr. Sherman changed Mr. Jacoby's medication to a drug called Tegretol, which is used to treat both seizures and depression.[5]

A few weeks later, on December 11, 2011, Mr. Jacoby completed another mental health services request form indicating that he needed treatment for "mental problems." He stated, "I don't feel good and every day I am in here I feel like I am deteriorating and losing my mind . . . . I need to see a psychiatrist . . . before I lose it please." BCCC medical staff did not receive this notice until two days later, on December 13, 2011. On December 12, Mr. Jacoby cut his throat with a razor blade and swallowed the blade, which he had snapped in half and wrapped in a paper towel. BCCC staff transported Mr. Jacoby to a nearby hospital where he received treatment for his wounds, a CAT scan revealing the ingested blades, and prescriptions for Lithium (a mood stabilizer), Remeron (an antidepressant), and Tegretol (the anti-seizure and antidepressant medication Dr. Sherman had prescribed). When Mr. Jacoby returned from the hospital that day, Corporal Carr, a BCCC classification officer charged with determining (with Nurse Wasdin's medical advice) which category of housing was appropriate for each inmate, placed Mr. Jacoby on suicide watch.

On suicide watch, each inmate was observed physically every 15 minutes,[6] clothed in a simple gown, given a sleeping mat, and prohibited from possessing

---

[5] Mr. Jacoby asserts that Dr. Sherman said he could prescribe medication for mental illness only by court order. Dr. Sherman's prescription of Tegretol contradicts this assertion, however.

personal property, bedding, or any clothing.  BCCC Commander Byrne, not a party to this appeal, testified that inmates on suicide watch were housed on F block.  Other inmates housed on F block included those in protective custody, administrative segregation, disciplinary segregation, and general watch.  None were issued razors.  Commander Byrne was aware that inmates in the adjacent cell block would sometimes slide contraband beneath the door of F block, but he testified that officers observed the area to prevent this from occurring.  Aside from the 15 minute checks, suicide watch cells were video recorded, and the feed was transmitted to officers stationed in BCCC's control pod.

Dr. Sherman saw Mr. Jacoby the day after the December 12 incident.  Mr. Jacoby would not speak to Dr. Sherman at this meeting, but Dr. Sherman listed on his medical forms a diagnosis of "personality disorder," seizures, and "possible depression bipolar."  Dr. Sherman ordered that Mr. Jacoby continue the three medications the hospital had prescribed.  Dr. Sherman also ordered that Mr. Jacoby's therapeutic blood levels be checked in a week to evaluate the medications' efficacy.

Mr. Jacoby soon began complaining about being on suicide watch.  Often in protest of his suicide watch status, but also when demanding to see a mental health

---

[6] BCCC staff evaluated each inmate on suicide watch every week.  If the inmate's risk of suicide was determined to have decreased, staff thereafter would observe the inmate only every 30 minutes.

professional, Mr. Jacoby refused to take his medication on occasion, declined several medical appointments, and threatened to refuse all medical care. On December 20, 2011, while still on suicide watch, Mr. Jacoby completed a health services request form stating that he was losing his mind, "getting angry[,] and feel[ing] like [he was] about to get violent and go off." He complained that he was "sick of being on suicide watch" and "want[ed] to be cleared." Based on his threats of violence, Corporal Carr determined on December 21 that Mr. Jacoby should remain on suicide watch.

The following day, Mr. Jacoby obtained a razor blade from another inmate, cut his throat and wrist, and again swallowed the blade. The officers who responded, which, according to Mr. Jacoby, included Corporal Crull, sprayed Mr. Jacoby with pepper spray and removed him from his cell. Mr. Jacoby averred that the BCCC staff failed to decontaminate him for eight hours. Corporal Crull testified that he arrived at Mr. Jacoby's cell that day only after Mr. Jacoby had been transported to the medical unit. He also testified that, each time he personally witnessed the use of pepper spray against Mr. Jacoby, Mr. Jacoby promptly was decontaminated. Nurse Wasdin testified that she was present in the medical unit when Mr. Jacoby arrived that day and that he was decontaminated immediately and taken to the local hospital.

BCCC medical staff again transported Mr. Jacoby to the hospital, where he was treated.  When he returned to BCCC, Nurse Wasdin placed him back on suicide watch, this time also requiring that his cell be searched each shift and that he be allowed out of his cell only while under supervision.  Mr. Jacoby remained on suicide watch until January 10, 2012.  On February 7, Dr. Sherman saw him after Mr. Jacoby completed a health services request form complaining that he had gained weight.  Dr. Sherman believed the weight gain to be attributable not to the Tegretol, as Mr. Jacoby insisted, but to the Remeron, but Dr. Sherman nonetheless discontinued the Tegretol, substituted a different anti-seizure medication, Dilantin, and also decreased Mr. Jacoby's intake of Remeron.  Mr. Jacoby immediately expressed his dissatisfaction with these medication changes, yelling at staff, threatening self harm, and refusing to take his medication.  Based on these threats and his history at BCCC, Nurse Wasdin and Corporal Carr transferred Mr. Jacoby once again to a suicide watch cell.[7]  Mr. Jacoby complained continually about his suicide-watch classification, asking to be returned to the general population because he was complying by taking his medication.  While on suicide watch in February, Mr. Jacoby obtained two metal pieces from other inmates and turned them over to staff.

---

[7] Dr. Sherman met with Mr. Jacoby again on February 21, while Mr. Jacoby was still on suicide watch.  At that meeting, Dr. Sherman switched Mr. Jacoby's anti-seizure medication to Neurontin at Mr. Jacoby's request.

Mr. Jacoby filed the instant suit in March 2012.[8]  He filed an amended complaint on July 11, 2012, after which the defendants filed answers and Special Reports, submitted testimony and documents, and requested the court to consider the filings as motions for summary judgment.  Mr. Jacoby then filed a motion for summary judgment and responses in opposition to the defendants' motions for summary judgment.  On May 7, 2013, a magistrate judge recommended that the district court treat the defendants' Special Reports as motions for summary judgment, grant those motions, and deny Mr. Jacoby's cross motion.  Over Mr. Jacoby's objections to some of those recommendations, the district court adopted the magistrate judge's recommendation, granted the defendants' motions for summary judgment, and denied Mr. Jacoby's motion.  Mr. Jacoby now appeals.

## II.

We review *de novo* summary judgment rulings, drawing all inferences and reviewing all evidence in the light most favorable to the non-moving party.  *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The moving party may meet its burden to show that there are no genuine

---

[8] He continued to harm himself and, after two incidents in August 2012, Nurse Wasdin petitioned a probate court to have Mr. Jacoby involuntarily committed.  The court declined, attributing Mr. Jacoby's self harm and aggression to a "personality disorder rather than a serious mental illness."

8

issues of material fact by demonstrating that there is a lack of evidence to support the essential elements that the non-moving party must prove at trial." *Moton*, 631 F.3d at 1341 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

### III.

As a preliminary matter, Mr. Jacoby contends the district court erred in ruling on the parties' motions for summary judgment before the defendants responded to his motion. He argues that the defendants' failure to respond to his summary judgment motion amounted to an admission of liability. We have made clear, however, that a district court "cannot base the entry of summary judgment on the mere fact that the motion was unopposed but, rather, must consider the merits of the motion." *Trs. of Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emp'rs v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1039 (11th Cir. 2004) (internal quotation marks omitted). Thus, the district court did not err in deciding the merits of Mr. Jacoby's motion without an official response from the defendants.[9]

We turn now to the merits of Mr. Jacoby's claims.

### A. Deliberate Indifference to Mental Health Needs

---

[9] We also note that the defendants previously had filed detailed Special Reports, which they asked the district court to construe as motions for summary judgment. And, under the Southern District of Alabama's local rules, the defendants were not required to respond to Mr. Jacoby's motion if he failed to meet his burden on summary judgment. *See* S.D. Ala. Local R. 7.2(b) ("[N]othing in this rule shall be construed to require the non-movant to respond in actions where the movant has not borne its burden of establishing that there is no dispute as to any material fact.").

Mr. Jacoby first contends the district court erred in granting summary judgment in favor of Dr. Sherman and Nurse Wasdin on his claim that they were deliberately indifferent to his mental health needs. He also challenges the district court's determinations that Sheriff Mack was not liable under a theory of supervisory liability and that Baldwin County was not liable for an unconstitutional custom or policy. We address these arguments in turn.

"[T]he minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner; both [rights] are violated by a government official's deliberate indifference to serious medical needs." *Lancaster v. Monroe Cnty., Ala.*, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997). To overcome a motion for summary judgment, a plaintiff must raise a genuine issue of material fact on the two components that make up a deliberate indifference claim: (1) the existence of an objectively serious medical need and (2) deliberate indifference to that need. *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal quotation marks omitted). Deliberate indifference requires subjective knowledge of a risk of serious harm due

10

to the medical need and disregard of the risk amounting to more than mere negligence. *Id.* at 1245-46.

We first conclude that Mr. Jacoby's mental health problems constituted a serious medical need. The record makes evident that Dr. Sherman, Nurse Wasdin, and BCCC staff recognized the seriousness of Mr. Jacoby's condition — he engaged in self harm, perseverated in complaining about his medications and lack of medical attention despite receiving attention, and showed outward signs of mania and depression. Mr. Jacoby's deliberate indifference claims fail, though, because Dr. Sherman and Nurse Wasdin attended to his needs and escalated the nature of their attempts to ensure Mr. Jacoby's safety and compliance each time he harmed himself.

Even viewed in the light most favorable to Mr. Jacoby, the facts do not show that Dr. Sherman or Nurse Wasdin had subjective knowledge of a serious risk of harm before Mr. Jacoby's first instance of self harm. Mr. Jacoby had informed Dr. Sherman and Nurse Wasdin that he suffered from various forms of mental illness. He also informed Nurse Wasdin that he had attempted suicide once in 2001 and once in 2005. But, on his initial medical assessment form, which Nurse Wasdin completed and Dr. Sherman reviewed, Mr. Jacoby indicated that his suicidal thoughts and tendencies were past, not present. Further, Dr. Sherman did not observe any symptoms of mental illness when he first examined Mr. Jacoby.

11

Nothing in the record establishes that either Dr. Sherman or Nurse Wasdin had subjective knowledge that Mr. Jacoby posed a serious risk to himself based on that initial assessment and appointment.

Beginning at the end of October 2011 and continuing throughout November, Mr. Jacoby submitted a number of health services request forms on which he indicated he suffered from bipolar disorder and needed medication. Dr. Sherman responded by prescribing Tegretol for seizures and depression. Mr. Jacoby did not mention any suicidal ideation or intention to harm himself until December 11, 2011. The undisputed evidence shows that request was not received by BCCC medical staff until two days later, the day after Mr. Jacoby's first incident of self harm.[10] Until the first incident, then, neither Dr. Sherman nor Nurse Wasdin was deliberately indifferent to Mr. Jacoby's mental health needs. *See Farrow*, 320 F.3d at 1243 (requiring subjective knowledge of a serious risk of harm for deliberate indifference claim).

From December 12 onward, Dr. Sherman and Nurse Wasdin undoubtedly had subjective knowledge of Mr. Jacoby's serious risk of harming himself. But

---

[10] We note that BCCC's failure to receive and respond to Mr. Jacoby's health services request form in a more timely manner may have been negligent. Mere negligence, however, cannot support a deliberate indifference claim. *See Farrow*, 320 F.3d at 1245-46. For this same reason, Mr. Jacoby's claim that Dr. Sherman was deliberately indifferent in failing to prescribe him medication for his bipolar disorder at his initial assessment or before the first incident (during which time Dr. Sherman had no indication from his examination that Mr. Jacoby posed a serious risk of harm to himself but had nonetheless prescribed an antidepressant) fails. At most, Dr. Sherman's conduct amounted to negligence.

Dr. Sherman continued to provide Mr. Jacoby the psychiatric medication the hospital had prescribed and monitored Mr. Jacoby weekly to evaluate any improvements or other changes in his condition.  Nurse Wasdin, in turn, placed Mr. Jacoby on close supervision in a suicide watch cell.  Eventually, after he had harmed himself on a number of occasions, Nurse Wasdin took the more drastic step of petitioning the probate court to have him involuntarily committed.  To the extent Mr. Jacoby challenges these actions, his claim is based on a disagreement with the course of treatment Dr. Sherman and Nurse Wasdin pursued.  Mr. Jacoby's difference of opinion regarding his treatment does not support an Eighth Amendment claim.  *See Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).[11]

Because we conclude that Dr. Sherman and Nurse Wasdin were not deliberately indifferent, we necessarily decide that neither Sheriff Mack nor Baldwin County can be held liable for deliberate indifference to Mr. Jacoby's mental health needs.  *See Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (*en banc*) (providing that a municipality's § 1983 liability is premised upon an underlying constitutional violation); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (noting that a supervisor is liable under § 1983 only if he personally participates in unconstitutional conduct or if his actions can be

---

[11] Mr. Jacoby has abandoned by not arguing on appeal his claim that Dr. Sherman was involved in his placement on suicide watch and was deliberately indifferent in regards to that placement. *See Reams v. Irvin*, 561 F.3d 1258, 1262 n.4 (11th Cir. 2009).

13

connected causally to a constitutional deprivation).  Thus, the district court did not err in granting summary judgment in favor of each of these defendants.

B.  Deliberate Indifference to an Unsafe Environment

Mr. Jacoby next asserts the district court erred in granting summary judgment in favor of Sheriff Mack and Baldwin County on his claim that, while on suicide watch, he was housed in an unconstitutionally unsafe environment because his suicide watch cell was situated such that other inmates routinely passed him (and others in suicide watch cells) dangerous contraband.[12]  According to Mr. Jacoby, inmates (including those on suicide watch) in F block would receive contraband from general population inmates in E block by pushing or using fishing line to feed items under the doors of each block.  Alternatively, F block inmates could obtain in trade contraband from others in the BCCC general population during shower or recreation time.  It is through these means, Mr. Jacoby alleged, that he obtained the razor he used to cut himself on December 22, 2011, as well as two pieces of metal in the weeks after that incident.  He contends the defendants knew but ignored this risk of contraband exchanges.

---

[12] On appeal, Mr. Jacoby contends for the first time that Corporals Crull and McCall are also liable for BCCC's unsafe environment.  Because he never asserted this claim against the corporals in the district court, we do not address those issues here. *See Miller v. King*, 449 F.3d 1149, 1150 n.1 (11th Cir. 2006).  And, because this is the only claim Mr. Jacoby advances against Corporal McCall on appeal, we affirm the district court's grant of summary judgment in his favor.

14

Commander Byrne, to whom Sheriff Mack delegated responsibility for daily operations at BCCC, testified that he knew "E and F inmates can slide a note or razor blade from block to block by pushing the object with force across the hallway and under the cell block door." He noted that officers "continually observ[e] this area," but inmates still occasionally succeed in passing contraband that way. Sheriff Mack testified generally to the fact that his policies for BCCC did not create unsafe conditions for inmates on suicide watch.

The district court was correct to conclude that, because there is no evidence that BCCC officers were deliberately indifferent, neither Sheriff Mack nor Baldwin County can be held liable on Mr. Jacoby's claim of an unsafe environment. "Where prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference." *Greason v. Kemp*, 891 F.2d 829, 835-36 (11th Cir. 1990). An officer is not deliberately indifferent "unless there was a strong likelihood, rather than a mere possibility, that suicide would result from a defendant's actions or inaction." *Heggs v. Grant*, 73 F.3d 317, 320 (11th Cir. 1996) (internal quotation marks omitted). Liability attaches only if the officer "knows of and disregards an excessive risk" of suicide. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

15

Here, it is clear that Commander Byrne knew there was a risk of contraband passing from general population inmates to inmates on suicide watch. The evidence is less than clear that Commander Byrne or the other officers knew contraband was passing in the manner Mr. Jacoby reported. In any event, BCCC staff took several measures to prevent passing of contraband and to discover any contraband that was transferred. The hallway between blocks E and F was consistently monitored, the suicide watch cells were video recorded and monitored from the officers' control pod, and officers performed physical checks of inmates on suicide watch every 15 or 30 minutes. In Mr. Jacoby's case, after he was discovered in possession of a razor the first time while on suicide watch, Nurse Wasdin employed additional means of supervision, requiring that officers search Mr. Jacoby's cell each shift and supervise him any time he left his cell. Thus, assuming BCCC officers knew of the specific risk that Mr. Jacoby would obtain contraband while on suicide watch under the cell block doors or otherwise, the evidence in the record belies any claim that the officers disregarded that risk generally or as to Mr. Jacoby. And, because any supervisory liability as to Sheriff Mack or municipality liability as to Baldwin County can attach only if Mr. Jacoby's constitutional rights were violated, neither is liable here. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989); *Cottone*, 326 F.3d at 1360.

16

Summary judgment in favor of Sheriff Mack and Baldwin County therefore was appropriate.

C. Excessive Force Claim

Mr. Jacoby next contends that Corporal Crull used excessive force when, on December 22, 2011, Corporal Crull and another officer used pepper spray to subdue him after he cut himself with a razor blade even though he was lying on his cell floor bleeding from his wounds.[13]  In his verified complaint, Mr. Jacoby asserted that the officers saw him begin to harm himself and, standing outside his cell, pepper sprayed him while he was lying on the ground bleeding from his wounds.  Also according to Mr. Jacoby, the officers failed to decontaminate him for eight hours.  The officers dispute this version of events (Corporal Crull denies even being present), and the BCCC nurse's notes in the record contradict Mr. Jacoby's contention about the delay.

An officer's excessive use of force violates the Eighth Amendment's ban on cruel and unusual punishment.  To establish such a claim, a plaintiff must show that the alleged wrongdoing was objectively "harmful enough" to amount to a constitutional violation and that "the officials acted with a sufficiently culpable state of mind," that is, "maliciously and sadistically to cause harm."  *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992) (alteration and internal quotation marks

---

[13] Mr. Jacoby does not appeal the district court's adverse judgment on his claim that Corporal Crull used excessive force on another occasion, around December 14, 2011.

17

omitted). "Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990).

We conclude that the district court correctly granted summary judgment in favor of Corporal Crull on Mr. Jacoby's claim that Corporal Crull and another officer used pepper spray to subdue him. Mr. Jacoby previously had threatened violence in addition to self harm, and the officers reasonably could have believed Mr. Jacoby might use the razor (that Mr. Jacoby admits the officers saw) in defense when the officers approached or to harm himself further. Thus, to extract Mr. Jacoby from his cell safely, the officers were justified in their use of pepper spray. *See id.*

Mr. Jacoby's assertion that the officers failed to decontaminate him for eight hours is better couched as a deliberate indifference claim. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (emphasizing that courts must hold *pro se* pleadings to less stringent standards than formal pleadings drafted by lawyers). "Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994) (citation and internal quotation marks omitted), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002). Deliberate indifference in the form of an unreasonable delay is

18

cognizable when prison officials delay treatment for life-threatening emergencies, but also in "situations where it is apparent that delay would detrimentally exacerbate the medical problem." *Id.* Ultimately, however, "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Id.*

As a preliminary matter, although Corporal Crull urges us to discredit Mr. Jacoby's statements about the eight hour delay in treatment and about Corporal Crull's involvement in the incident, we will not do so at the summary judgment stage. *See* 28 U.S.C. § 1746; *Barker v. Norman*, 651 F.2d 1107, 1114-15 (5th Cir. Unit A July 1981)[14] (noting that allegations in a verified complaint, made under penalty of perjury, meet Federal Rule of Civil Procedure 56's requirements for affidavits and sworn declarations). Thus, at this stage, we must take as true Mr. Jacoby's assertion that officers failed to decontaminate him for eight hours.

Even taking this assertion as true, however, Mr. Jacoby's deliberate indifference claim based on the decontamination delay he alleges cannot survive Corporal Crull's motion for summary judgment. Mr. Jacoby's complaint contains no allegation that the pepper spray or the delay in decontamination caused him

---

[14] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

injury, and no evidence in the record otherwise indicates that he suffered any harm as a result of the pepper spray. *See Hill*, 40 F.3d at 1187. Thus, Mr. Jacoby's contentions regarding the pepper spray are insufficient to create a genuine issue of material fact on his deliberate indifference claim against Corporal Crull.

D. Retaliation Claim

Last, Mr. Jacoby contends Nurse Wasdin and Corporal Carr wrongfully placed him on suicide watch on February 8, 2012, in retaliation for his failure to take the seizure medication he was prescribed. An inmate must establish three elements to prevail on a retaliation claim: (1) "his speech or act was constitutionally protected," (2) "the defendant's retaliatory conduct adversely affected the protected speech," and (3) "there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). Where evidence shows that the inmate committed an infraction and the officials' conduct was in response to that behavior, the officials' response is not retaliatory. *See O'Bryant v. Finch*, 637 F.3d 1207, 1215 (11th Cir. 2011).

When Mr. Jacoby previously had refused to take his medications and made demands about his prescriptions or other conditions, he often harmed himself very shortly thereafter. This time, on February 7, 2012 — the day before Corporal Carr and Nurse Wasdin returned him to suicide watch — Mr. Jacoby completed a health

services request form in which he stated, "if I start getting depressed and having manic states from not taking my meds it's on you!!"  Thus, by the time he again complained on February 8, Nurse Wasdin and Corporal Carr were within their authority to place Mr. Jacoby in a more protective environment in anticipation of any self harm that might follow.  *See O'Bryant*, 637 F.3d at 1215.  This was not retaliatory conduct, and the district court correctly granted summary judgment in favor of Nurse Wasdin and Corporal Carr on this claim.

IV.

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of defendants Baldwin County, Sheriff Mack, Corporals Carr, Crull, and McCall, Dr. Sherman, and Nurse Wasdin and denial of Mr. Jacoby's cross motion.

**AFFIRMED.**