[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-12975

_____

D.C. Docket No. 8:13-cv-02187-CEH-TGW

DEBORAH A. KENNING, as the Personal Representative of the
Estate of Robert Allen Cortes,

Plaintiff–Appellant,

versus

DANIEL CARLI, Officer,
in his individual capacity,
JORDAN HERNANDEZ, Officer,
in his individual capacity,
CITY OF LAKELAND, FLORIDA,

Defendants–Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 15, 2016)

Before HULL, JULIE CARNES, and CLEVENGER,[*] Circuit Judges.

JULIE CARNES, Circuit Judge:

Plaintiff appeals the district court's order granting summary judgment to Defendants on claims arising out of the shooting of her son, Robert Cortes, by City of Lakeland police officers Daniel Carli and Jordan Hernandez. The shooting occurred during a confrontation between Cortes and the officers on March 15, 2012. Plaintiff asserted § 1983 excessive force claims[1] against Carli and Hernandez in their individual capacities, and a state battery claim against the City. The district court concluded that the shooting was reasonable under the circumstances, and granted summary judgment on all of Plaintiff's claims.

## BACKGROUND

### I.    Factual Background

On March 15, 2012, Lisette Galarza requested that the Lakeland police department assist her in retrieving her belongings from the trailer she had previously shared with Robert Cortes. Lakeland police officers Daniel Carli and Jordan Hernandez responded to the call, and were advised by dispatch that the

---

[*] Honorable Raymond C. Clevenger, III, United States Circuit Judge for the Federal Circuit, sitting by designation.

[1] Plaintiff's excessive force claims arise under the Fourth Amendment, which guarantees an individual's right to be free from unreasonable searches and seizures, including the right to be free from excessive force during a criminal apprehension. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989).

owner of the trailer was known to be armed with a gun.  The officers met Galarza, who was riding in a car driven by her friend Kimberly Olson, near the entrance to the trailer park where Cortes lived.  Galarza told the officers that she and Cortes had a history of domestic violence problems and had been arguing.  She said that she wanted to retrieve some personal items from Cortes's trailer but was afraid to go into the trailer alone, and that she needed police assistance to ensure there were no problems.  Carli asked Galarza if Cortes had a gun, but Galarza responded that she did not know.

The officers subsequently followed Olson and Galarza to Cortes's trailer.  When they arrived, Olson pulled into the driveway and parked close to the front door of the trailer.  The officers parked their police cruisers next to and behind Olson's car.  Without activating their lights or sirens, the officers exited their cruisers and positioned themselves in the yard within five to fifteen feet of the trailer door.  Specifically, Carli stood beside a large tree directly in front of and about fifteen feet away from the door, and Hernandez stood slightly to the right of Carli, also facing the door and standing about five to ten feet away from it.  Olson remained in the yard, standing beside her car and in a position where she could see the trailer door.

The door of Cortes's trailer was approximately three steps off the ground.  Galarza walked up the steps, knocked on the door, and announced that she was

3

there with the police to pick up her belongings. She walked back down the stairs and into the yard. A few minutes after Galarza knocked, Cortes looked through his blinds at Galarza and the officers. He then opened the door to the trailer and stood in the doorway with a gun in his right hand. Carli yelled "Gun, gun, gun" and drew his own gun. Upon hearing this, Hernandez also drew his gun and used his shoulder mic to signal an emergency on his police radio.

The officers yelled at Cortes to drop the gun, put his hands up, and get down onto the ground. Although Cortes did not immediately comply, he eventually placed the gun inside the threshold of the open trailer door, raised his hands up to a position level with his head, and started to walk down the steps. When Cortes reached the bottom step, Carli instructed him to get "all the way down on the ground, lying face down on the ground." But Cortes did not get down on the ground; rather, he stopped moving forward and yelled something at Carli. Then, according to the officers, Cortes turned away from them, took a step up and back towards the trailer door, and reached with his left hand for the gun that lay in the doorway.

Both officers told Cortes to "Stop." Cortes did not touch the gun, and he had not previously threatened anyone with it. Nevertheless, the officers testified that they believed Cortes was trying to get the gun and that they feared for their own lives, as well as for the lives of Galarza and Olson, should he succeed. Both

4

officers stated that they fired at Cortes after he turned away from them and as he was reaching for the gun in the doorframe.  Carli fired six times and Hernandez fired three times.  Hernandez hit Cortes once, in the back of his right arm, and Carli hit Cortes six times, in his back.  Cortes fell and landed face down in front of the steps.

Karenetta Wood, a neighbor who witnessed the incident from her nearby trailer, provided conflicting but inconsistent testimony about the events immediately preceding the shooting.  Wood testified that Cortes walked out of the trailer with his hands up "near his shoulders."  She stated that she could tell Cortes's hands were empty because she could see his fingers in the air. Nevertheless, Wood heard an officer say, "Put the gun down."  Wood initially testified that Cortes was facing the officers with empty, raised hands when he was shot.  But she later admitted that she did not know whether Cortes had turned away from the officers or made any other movements prior to the shooting, and that she did not see where the bullets struck Cortes, although she assumed it could not possibly have been in the back.[2]

Carli immediately reported the shooting, and requested EMS assistance. Galarza began screaming hysterically, yelling at Carli that she would sue him if

---

[2]  Olson witnessed the shooting but did not know which direction Cortes was facing when he was shot or where the bullets struck him.  Galarza disappeared after the incident, so neither party was able to elicit her testimony as to the events surrounding the shooting.

Cortes died.  Unsure whether any more people were in the trailer and with the gun still lying in the doorway, the officers secured Galarza, took a position of cover, and redrew their guns.  They did not render medical aid to Cortes or make any other physical contact with him until other officers arrived on the scene.  Backup officers eventually arrived, and they searched and secured the trailer.  Cortes died at the scene.

Dr. Vera Volnikh, a medical examiner, performed an autopsy on Cortes.  Dr. Volnikh concluded that Cortes had suffered seven gunshot wounds, one of which caused his death.  She determined that all seven gunshots entered into the back of Cortes's body—six into his lower or middle back and one that entered into the back of his right arm, exited the front of the arm, and reentered into his right torso.  No entrance wounds were located in the front of the body.  The autopsy report describes the wounds, and the direction of the wound paths.  However, Dr. Volnikh testified that she could not determine the chronological order of the wounds or exactly what position Cortes was in when he was shot.[3]  Pictures taken of the scene after the shooting show a gun lying in the doorway of the trailer.

---

[3] Based on a toxicology report that was part of the autopsy, Dr. Volnikh also determined that Cortes was under the influence of methamphetamine, methadone, and other drugs at the time of his death.

## II.    <u>Procedural History</u>

Plaintiff filed a complaint asserting § 1983 excessive force claims against Carli and Hernandez individually, based on an alleged Fourth Amendment violation, as well as a state battery claim against the City. Following discovery, Defendants moved for summary judgment on all of Plaintiff's claims. The district court granted the motion. As to the excessive force claims, the court determined that the physical evidence conclusively established that Cortes had turned back toward the trailer door just prior to the shooting, rather than getting on the ground as he was instructed to do, and that it was thus reasonable for the officers to believe he was reaching for his gun and presented a "serious and potentially deadly danger" to themselves and others. Accordingly, the court held that the officers' use of deadly force was reasonable under the circumstances and did not violate the Fourth Amendment. Based on its conclusion that the use of force was reasonable, the court likewise granted summary judgment on the state battery claim. *See City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996) (noting that, under Florida law, force used by police officers during an arrest only constitutes a battery if it is excessive).

## DISCUSSION

### I.    Standard of Review

We review a district court's order granting summary judgment de novo. *Broadcast Music, Inc. v. Evie's Tavern Ellenton, Inc.*, 772 F.3d 1254, 1257 (11th Cir. 2014).  In conducting our review, we construe the evidence and draw all inferences in favor of Plaintiff.  *Id.*  "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Id.* (quoting Fed. R. Civ. P. 56(a)).  "A mere 'scintilla' of evidence" is insufficient to withstand summary judgment.  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).  Rather, "there must be enough of a showing that the jury could reasonably find" for Plaintiff.  *Id.*

Specifically with regard to qualified immunity, we acknowledge that the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case."  *McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009) (citation and quotation marks omitted).  Nevertheless, we view the facts from Plaintiff's perspective because the determinative issue on appeal is "not which facts the parties might be able to prove" but rather, whether "certain given facts" demonstrate a violation of clearly established law.  *Crenshaw v. Lister*, 556 F.3d 1283, 1289 (11th Cir. 2009).  *See also Tolan v. Cotton*, 134 S. Ct. 1861, 1866

(2014) (noting "the importance of drawing inferences in favor of the nonmovant" in the qualified immunity context).

## II.    Plaintiff's Excessive Force Claims Against Carli and Hernandez

The district court held that Carli and Hernandez were entitled to qualified immunity on Plaintiff's excessive force claims. "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Plaintiff's excessive force claims arise out of Cortes's shooting. It is undisputed that the officers were engaged in a discretionary duty when they shot Cortes. It is thus Plaintiff's burden to show that qualified immunity is not appropriate. *Id.* at 995.

To meet this burden, Plaintiff must satisfy a two-part test. *See McCullough*, 559 F.3d at 1205. First, she must show that the officers' conduct violated a constitutional right, the right at issue here being the Fourth Amendment right to be free of an unreasonable seizure. *Id.* Assuming a violation, Plaintiff must show the constitutional right was clearly established at the time of the incident. *Id.* Viewing the evidence in the light most favorable to Plaintiff, neither prong is satisfied here.

9

A.    Constitutional Violation

Plaintiff's excessive force claim is analyzed under the "objective reasonableness" standard of the Fourth Amendment. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (citing *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985)). Reasonableness in this context depends on all the circumstances relevant to an officer's decision to use force and the amount of force used. *See id.* We view the circumstances "from the perspective of a reasonable officer on the scene." *Id.* (quotation marks omitted). And we allow for the fact that officers are often required to make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (quotation marks omitted).

It is reasonable, and therefore constitutionally permissible, for an officer to use deadly force against a person who poses an imminent threat of serious physical harm to the officer or others. *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005). *See also McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003) (finding no constitutional violation where an officer shot a suspect he "could reasonably perceive" as posing "an imminent threat of violence to the officer and other bystanders"). The record evidence unequivocally supports the officers' claim that Cortes posed such a threat when he was shot. Specifically, upon looking through his blinds and seeing Galarza with two police officers in the

10

yard, Cortes appeared in the doorway of his trailer armed with a gun.  After some hesitation, Cortes initially complied with the officers' commands to drop the gun by placing it in the threshold of the open trailer doorway.  He then walked down the trailer steps with his hands up.  However, when he reached the bottom step, Cortes stopped moving forward and failed to get down on the ground, as he was instructed to do.  Carli and Hernandez both testified that Cortes subsequently turned and took a step back toward the open trailer door, causing them to fear that he was trying to retrieve the gun he had left there and, consequently, to fire at him.  Their testimony is supported by the autopsy report, which shows that all of the gunshots that hit Cortes entered the back of his body—either in his back or in the back of his right arm.

Citing deposition testimony from Olson and Wood, Plaintiff argues that there is a question of fact as to whether Cortes turned back toward the trailer door prior to being shot.  We are unpersuaded.  Olson stated in her deposition that she did not see Cortes turn his back on the officers, and she suggested at one point in her testimony that Cortes was shot in the front of his body:  an assertion flatly contradicted by the autopsy report.  Moreover, she later clarified that she did not specifically remember whether Cortes was shot in the front or the back of his body.  Olson explained that she was in shock and in fear for her life when she saw Cortes come out of the trailer with a gun, causing her to back away and retreat behind her

11

car.  As a result, Olson never saw Cortes put down the gun he was holding (and in fact believed that he held the gun throughout the entire encounter), never saw Cortes put his hands up prior to being shot, did not remember if Cortes walked down the steps at any time prior to being shot, and did not know if Cortes made any movements before he was shot or if he was facing the officers when he was shot.

Wood's testimony is similarly inconsistent on the essential point for which Plaintiff cites it.  Wood claims to have viewed the shooting and its preceding events from her trailer 50 to 70 feet away.[4]  Wood initially stated that Cortes did not turn back toward the trailer prior to being shot and that he was facing the officers when they fired.  But like Olson, Wood later clarified that she did not see what Cortes did prior to being shot, did not know whether he turned or made any other movements, and could not say for sure whether he put his arms down by his side because the incident "happened so fast."  She "guess[ed]" Cortes did not turn away from the officers before he was shot because when she walked by later she

---

[4] Some of Wood's testimony, however, is contradicted by facts that Plaintiff does not dispute. Wood testified, contrary to the undisputed facts, that one of the officers knocked on Cortes's door rather than Galarza, and that Cortes immediately answered the door.  She stated further that she could see Cortes's whole body when he opened the door, and that he came out of the door with his hands in the air and "absolutely nothing" in them, albeit she acknowledged hearing an officer say, "Put the gun down."

saw that he was "laying looking up."[5]  She repeatedly acknowledged that she did

not see Cortes get hit and did not know where the bullets struck him, but she also

insisted that he could not possibly have been shot in the back of his body.

In fact, we know from the autopsy report that Cortes was *only* shot in the

back of his body, meaning Wood was wrong when she testified to the contrary.

Dr. Volnikh determined that Cortes was hit with seven bullets, all of which entered

into the back of his body—six into his back and one into the back of his right arm.

Plaintiff did not present any evidence to refute the autopsy results.  Plaintiff relies

heavily on Dr. Volnikh's testimony that she could not, by examining the bullet

wounds, determine the exact position of Cortes when he was shot.  However, we

do not need to know the exact position of Cortes.  Rather, all we need to know is

whether Cortes turned away from the officers and toward the trailer door just prior

to being shot.  In the absence of any evidence to support Plaintiff's theory to the

contrary, the autopsy results showing that Cortes was shot seven times in the back

of his body, and only in the back of his body, conclusively establish that he had

turned away from the officers at the time he was shot.

Significantly, Dr. Volnikh stated that although she could not determine

Cortes's exact position, she could opine as to whether a certain position was

---

[5]  As mentioned, Hernandez testified that Cortes fell face down in front of the steps when he was shot.  According to Hernandez, Cortes subsequently was rolled over onto his back.

13

possible, if given a hypothetical.  Yet Plaintiff's counsel did not ask Dr. Volnikh

the follow-up question whether it was possible Cortes was facing the officers with

his hands up when he was shot.  Nor did Plaintiff present any other evidence—

from a different medical examiner or a ballistics expert, for example—to support

an assertion that Cortes could have been facing the officers with his hands up when

he was shot.

In response to the summary judgment motion, Plaintiff's counsel theorized

that perhaps the first shot entered into the back of Cortes's arm while he was facing

the officers with his hands raised, and that Cortes then turned his body away from

the officers to avoid the gunfire, causing the rest of the shots to enter into his

back.[6]  The district court properly rejected counsel's theory, as it was without any

evidentiary basis in the record.  We note further that this theory is contradicted by

the unrefuted record evidence that the bullet from this shot entered into the back of

Cortes's right arm (the tricep) about three inches above the elbow, exited the front

of the arm (the bicep) traveling on an upward trajectory, and then reentered

Cortes's right torso on a path that continued upward.  The placement of the entry

and exit wounds would be physically impossible if Cortes had been facing the

---

[6] Plaintiff raises two additional theories on appeal.  As Plaintiff did not present those theories to the district court, we do not consider them on appeal.  *See Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1125 (11th Cir. 2014) ("We have said repeatedly that we will not consider an issue raised for the first time on appeal."); *Juris v. Inamed Corp.*, 685 F.3d 1294, 1325 (11th Cir. 2012) (explaining that "if a party hopes to preserve a claim, argument, theory, or defense on appeal, she must first clearly present it to the district court") (internal quotation marks omitted).

officers with his hands near his shoulders when the shot was fired.  In addition, it is undisputed that it was Hernandez who fired this shot into Cortes's arm.  Hernandez was standing to the right of the trailer door, such that he would have been facing Cortes's left side, when Cortes exited the trailer, walking toward the officers. Hernandez could not have fired a shot into the back of Cortes's right arm from this position unless Cortes had first turned before Hernandez fired.

Given the internal inconsistency of Plaintiff's proffered evidence on this issue, and the entirely contradictory physical evidence, a jury could not reasonably infer from the cited testimony that Cortes was facing the officers, with his hands up and otherwise complying with their commands, when he was shot.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Kesinger v. Herrington*, 381 F.3d 1243, 1249 (11th Cir. 2004) (disregarding eyewitness testimony that was in direct conflict with the unanimous testimony of other witnesses and with the undisputed physical evidence).  Rather, the record evidence conclusively establishes that, in defiance of Carli's order to get down on the ground, Cortes turned away from the officers and back toward the gun lying in the open trailer doorway just prior to

15

being shot.[7] *Cf. Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) (denying qualified immunity where the plaintiff's account of the events preceding a police shooting could "reasonably be harmonized" with the forensic evidence).

Based on the record evidence, there is no question that a reasonable officer could—and likely would—have perceived Cortes as posing an imminent threat of serious physical harm to themselves and to Galarza and Olson, who were standing nearby. *See Garczynski v. Bradshaw*, 573 F.3d 1158, 1168 (11th Cir. 2009) (concluding that the defendant officers reasonably reacted with deadly force to the imminent threat posed by a suicidal man who was ignoring their commands to drop the gun he was holding and to show his hands). The officers were not required to wait and see what might happen if they did not stop Cortes from reaching the gun that lay in the open trailer doorway. *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."). Their decision to use deadly force was reasonable under the circumstances, and thus in compliance with the Fourth Amendment.

---

[7] Plaintiff argues in her appellate brief that this version of the events is inconsistent with the physical evidence because of the way Cortes's body came to rest, on his back with his feet closest to the stairs and his head closest to the officers. Plaintiff's counsel speculates that if the shooting had occurred the way the officers described, the momentum of the shot would have pushed Cortes forward. We do not need to address this argument because it has no evidentiary basis and it was not raised in the district court. But we note that Dr. Volnikh testified that an individual with wounds similar to Cortes's, especially if he was under the influence of methamphetamine as Cortes was, could have run several feet after being shot.

B.    Clearly Established Law

Even assuming a constitutional violation, Carli and Hernandez are entitled to qualified immunity unless Plaintiff can show that his Fourth Amendment rights were "clearly established" at the time of the shooting. *Plumhoff*, 134 S. Ct. at 2023. To be clearly established, the contours of a right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* "The salient question is whether the state of the law at the time of an incident provided fair warning to the defendant[] that [his] alleged conduct was unconstitutional." *Tolan*, 134 S. Ct. at 1866 (quotation marks omitted and alterations adopted).

Fair warning is commonly provided by materially similar precedent from the Supreme Court, this Court, or the highest state court in which the case arose. *See Terrell v. Smith*, 668 F.3d 1244, 1256 (11th Cir. 2012). However, a case directly on point is not required as long as "existing precedent" placed the "constitutional question beyond debate." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quotation marks omitted). *See also Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010) ("[J]udicial precedent with materially identical facts is not essential for the law to be clearly established.").

As suggested by the above discussion, there is no case law that would have put Carli and Hernandez on notice that their conduct was unlawful. Plaintiff cites

17

*Mercado v. City of Orlando*, 407 F.3d 1152, 1159–1160 (11th Cir. 2005), for the general proposition that deadly force cannot be used in a situation that requires less than deadly force. We agree with that statement of the law, but we do not believe it applies here. Nor do we believe *Mercado* could have provided fair warning to the officers that their conduct was unconstitutional. The plaintiff in *Mercado* was threatening suicide, with a cord wrapped around his neck and a knife pointed toward his heart, when the defendant officer encountered him. *Id.* at 1154. That plaintiff made no threatening moves and did not have time to comply with the officer's command to drop the knife before the officer used deadly force against him. *Id.* at 1154–55, 1157. In contrast, Cortes had time to comply with Carli's command to get down on the ground, but instead he defied the officer's command by turning back toward the gun lying in the open trailer doorway: a movement the officers reasonably perceived as threatening. Given those critical distinctions, *Mercado* is insufficient to meet Plaintiff's burden to show that the officers violated Cortes's clearly established rights by using deadly force against him under the particular circumstances of this case. *See Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016) (citing *Mercado* and noting that "a person standing six feet away from an officer with a knife may present a different threat than a person six feet away with a gun").

18

### III.    Plaintiff's State Battery Claim

The City cannot be held liable for battery under Florida law unless the force used by Carli and Hernandez was "clearly excessive."  *See Sanders*, 672 So. 2d at 47.  *See also Davis v. Williams*, 451 F.3d 759, 768 (11th Cir. 2006) (noting that an officer's use of excessive force constitutes a battery under Florida law).  The relevant inquiry is governed by the reasonableness analysis employed above. *Davis*, 451 F.3d at 767.  Thus, our conclusion that the officers' use of force was reasonable under the circumstances precludes Plaintiff's state battery claim against the City.

### CONCLUSION

For the reasons discussed above, we agree with the district court's conclusion that Carli and Hernandez are entitled to qualified immunity on Plaintiff's excessive force claims, and that there is no basis for imposing liability on the City under state law.  Accordingly, we **AFFIRM** the order of the district court granting summary judgment.

19