[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-17093
_____

D.C. Docket No. 1:13-cv-21350-DLG

ANDRES GREGORY,
as Personal Representative of the Estate of Sebastian Gregory (Deceased),
AMALIA VILLAFANE-GREGORY,
individually, and as parents and natural guardians of Sebastian Gregory,

                                        Plaintiffs - Appellants,

versus

MIAMI-DADE COUNTY, FLORIDA,
OFFICER LUIS PEREZ,

                                        Defendants - Appellees.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(November 15, 2017)

Before HULL, JORDAN, and GILMAN,[*] Circuit Judges.

HULL, Circuit Judge:

Sebastian Gregory ("Gregory") and his parents, Andres Gregory and Amalia Villafane-Gregory, brought this lawsuit against police officer Luis Perez and Miami-Dade County, Florida ("Miami-Dade") alleging a violation of Gregory's Fourth Amendment rights under 42 U.S.C. § 1983 and violations of Florida state law. On May 28, 2012, Officer Perez stopped Gregory, who was walking down the street, and, after a disputed series of events, shot Gregory nine times, leaving him severely injured.

The plaintiffs appeal the district court's grant of a motion to dismiss the claims against Miami-Dade and the district court's grant of a motion for summary judgment on certain claims against Officer Perez. After thorough review, and with the benefit of oral argument, we affirm in part, reverse in part, and remand the case to the district court.

## I.    FACTUAL BACKGROUND

### A.    Officer Perez Encounters Gregory

On May 28, 2012, Officer Perez was working routine patrol on the midnight shift in the Hammocks District in Miami-Dade. It was a hot and humid night. Officer Perez had worked the midnight shift patrol in the Hammocks District for

---

[*]Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

2

two years.  The Hammocks District had experienced a string of vehicle theft over the previous few months.  On this night, Officer Perez was in uniform and driving a marked police car.

At approximately 3:30 a.m., Officer Perez was driving eastbound on SW 72nd Street in the right hand lane when he noticed a person—Gregory—walking in the opposite direction on the same side of the street.  Officer Perez was driving well below the speed limit.

Gregory was wearing a black, baggy sweater on top of a purple t-shirt, with blank pants, a black scully cap (or beanie) on his head, and black shoes.  Gregory had with him a metallic bat, an IPod with headphones, a cellphone, and a white trash bag.  Gregory carried the metallic bat in his top right pants pocket, with the barrel of the bat inserted all the way into the pocket and the top of the bat tucked under his sweater.

Officer Perez slowed down as he approached Gregory in his police car.  As Officer Perez's car drew closer, Officer Perez noticed Gregory's black sweatshirt, pants, and beanie.  Officer Perez claimed that he could see a bulge on Gregory's right hip with two inches of a shiny metallic object visible between the bottom of

3

Gregory's sweatshirt and the top of his pants.[1]  Officer Perez passed Gregory and made a u-turn.  Gregory did not see Officer Perez drive past him.

### B.    Officer Perez Stops Gregory

After making a u-turn, Officer Perez drove his marked police car behind Gregory and attempted to effectuate a stop.  Gregory did not react to the police car pulling up behind him.  While Gregory was still walking along the road, Officer Perez activated the blue and red emergency lights and the spotlight on his police car.  Gregory saw the emergency lights from the police car but did not turn around or stop walking.

Officer Perez then exited his car and drew his firearm.  Gregory continued walking for at least several seconds after Officer Perez exited his car.  Officer Perez, with his weapon drawn, moved towards Gregory.  Officer Perez loudly identified himself and directed Gregory to show his hands.  Gregory heard Officer Perez talking but did not know what Officer Perez had said, so Gregory stopped and turned his head around and looked back at Officer Perez for five or six seconds.

---

[1]The parties dispute whether at various times Officer Perez could see a small metallic portion of what would be the t-ball bat in Gregory's pocket, but whether Officer Perez could see something metallic or just a bulge is immaterial, as a reasonable officer could perceive the bulge was a weapon, including a gun.

## C.     The Earlier Encounter between Officer Perez and Gregory

At this point Officer Perez recognized Gregory as someone he had arrested the previous month.  In April 2012, Officer Perez had arrested Gregory while on routine patrol in the same Hammocks District area.  On that previous occasion, Gregory was carrying three concealed weapons—a metallic T-ball bat and two knives.  Officer Perez checked Gregory's records, which showed that Gregory had an open warrant for failure to appear in court on a prior concealed weapons charge and had previously been arrested several times, including for burglary, aggravated battery, concealed weapons, and possession of a weapon on school property.[2] From this April 2012 incident, Gregory was charged with three counts of carrying concealed weapons.

## D.     Officer Perez Orders Gregory to the Ground

After recognizing Gregory, Officer Perez ordered Gregory to lay prone on the ground.  Gregory got on the ground.  At this point Officer Perez stood approximately seven feet away from Gregory.  According to Officer Perez, Gregory was laying perpendicular to the sidewalk, with his head facing south (away from the street) and his feet to the north (closer to the street).  Officer Perez was on Gregory's left side (to the east).  Gregory testified that he laid flat on the

---

[2]The parties dispute whether Gregory also had a gang affiliation, but that fact is largely immaterial given Gregory's undisputed criminal history.

ground in the same direction as the street (parallel to the street) with his head away from Officer Perez and his feet closest to Officer Perez.

Gregory complied with Officer Perez's order to get on the ground but never said anything or told Officer Perez that he was going to make a movement.

### E.     The Moments before Officer Perez Shot Gregory

Officer Perez had his firearm trained on Gregory.  According to Officer Perez, he glanced down to his radio, and Gregory rolled his body towards Officer Perez, so that Gregory was up on his left hip and shoulder.  Officer Perez testified that Gregory's right hand moved quickly to touch the bulge on his side, which Officer Perez believed was a gun.[3]  Officer Perez believed that Gregory was going to pull out a gun and shoot him.  Officer Perez then shot Gregory.  Bullets entered Gregory's body from both the left and the right side.

In his deposition and at an evidentiary hearing before the district court, Gregory disputed Officer Perez's account.  As described above, Gregory said that he complied with Officer Perez's command to lie on the ground and that he laid down on the ground, parallel to the street with the right side of his body closer to the street and his head farthest from Officer Perez.  Gregory testified that his hands

---

[3]In his deposition, Officer Perez testified that Gregory's "right hand move[d] quickly to what" Officer Perez believed was a gun.  Officer Perez told the medical examiner that Gregory used both his left and right hands to grab at the item in his waistband and that Gregory "was rolling back and forth, from side to side as he" tried to grab the item.  The medical examiner noted that it was "not known how many times Mr. Gregory rolled from side to side" but that Officer Perez claimed to have only stopped firing once Gregory stopped rolling and stayed face-down.

were horizontal with his elbows bent and to the side and his palms around shoulder level.  Gregory stated that his hands never left that u-shaped position.

Gregory claimed that he never moved his hands or his body but only "wobbled [his] leg a little bit" so that he could lie on the ground because the bat was uncomfortable and was bothering him.  His leg moved side to side.  Gregory explained that the bat was at least partially under him, pressing into his stomach, and very uncomfortable.

Gregory testified that he never moved his hands towards the lower part of his body.  Gregory also testified that his body remained planted on the ground the entire time but that when he wobbled Officer Perez shot him.

As discussed infra Part II.B, the district court denied Officer Perez's motion for summary judgment as to Gregory's § 1983 claim for excessive force under the Fourth Amendment based on the above conflicting testimony.

## F.    Gregory's Television Interview

After the district court denied summary judgment as to the § 1983 excessive force claim, Officer Perez discovered a January 2015 interview Gregory did for a Colombian television show.  In the televised videotaped interview, Gregory discussed his May 28, 2012 late-night encounter with Officer Perez.  At one point,

Gregory reenacted how he had laid down on the sidewalk on that night. But at a different point, Gregory sat in a chair while answering a reporter's questions.[4]

The television broadcast video shows Gregory lying on the sidewalk, parallel to the street with the right side of his body closest to the street. A voiceover narrator states that Gregory said "that he made a movement to slide the bat in his pants." In the video, Gregory's hands are up near his head, and he does not move them down towards his legs while he is on the sidewalk. The video subsequently shows Gregory sitting in a chair with his left arm around his waist with his left hand above his right side, while Gregory says: "I tried to move the bat to one side and that's when the officer shot me." Officer Perez contends that this portion of the video shows Gregory admitting that he reached for the bat with his hand.

## G.   The Shooting and Forensic Evidence

When Officer Perez shot Gregory, bullets entered Gregory's body from both the left and right sides. A photograph taken after the shooting showed Gregory handcuffed with his head towards the grass (south) and his feet towards the street

---

[4]The video is almost entirely in Spanish, but Officer Perez had subtitles added before submitting in as a CD to the district court. Gregory does not dispute the accuracy of the translation.

(north).  The bat was in his right front pocket.  Nine shell casings were found at the scene loosely grouped in front of (west of) Officer Perez's vehicle.[5]

According to the medical examiner, Gregory suffered six gunshot wounds. Three gunshots wounds traveled from left to right in Gregory's body.  Two others traveled right to left.  One bullet went from back to front very slightly left and very slightly upward and struck the base of Gregory's spine.

Gregory's sweater, shirt, underpants, and jeans all had holes in them that correlated with the gunshot wounds.  One bullet perforated the t-ball bat and traveled right to left and upwards across Gregory's right hip and lower abdominal area.  The holes in the bat align with the holes in the right front pocket of Gregory's jeans and a tear in his belt.

## II.    PROCEDURAL HISTORY

### A.    Complaint and Motion to Dismiss

On April 18, 2013, plaintiffs filed this lawsuit against Miami-Dade and Officer Perez.  On October 9, 2014, the plaintiffs filed their third amended complaint.  The third amended complaint contained the following eight claims: (1) excessive force during an illegal stop under § 1983 and the Fourth Amendment against Officer Perez (Count I); (2) excessive force during a legal stop under § 1983 and the Fourth Amendment against Officer Perez (Count 2); (3) state law

---

[5]The crime scene photographs show the shell casings grouped on the street in front of the police car, while the blood stains are on the sidewalk almost directly below the shell casings.

battery against Miami-Dade (Count III); (4) state law battery against Officer Perez (Count IV); (5) state law intentional infliction of emotional distress against Officer Perez (Count V); (6) state law false imprisonment against Officer Perez (Count VI); (7) state law false imprisonment against Miami-Dade (Count VII); and (8) loss of filial consortium by the parents against both defendants (Count VIII).

On February 13, 2015, the district court, in an amended order, granted Miami-Dade's motion to dismiss the state law claims of battery, false imprisonment, and loss of filial consortium brought against it (Counts III, VII, and VIII) on the basis of sovereign immunity. The district court first reasoned that Florida had not waived sovereign immunity for acts of malice, bad faith, or willful and wanton disregard for human safety and second concluded that the facts alleged "can only be characterized as stating claims for acts done in bad faith or in a willful and wanton manner."

## B.    First Motion for Summary Judgment and First Appeal

On April 17, 2015, Officer Perez filed his motion for summary judgment. On July 17, 2015, the district court granted in part and denied in part Perez's motion for summary judgment. The district court granted Perez's motion as to the following claims: (1) excessive force during an illegal stop (Count I), intentional infliction of emotional distress (Count V), false imprisonment (Count VI), and loss of filial consortium (Count VIII). The district court denied the motion for

summary judgment as to the excessive force during a legal stop (Count II) and state law battery (Count IV) claims.

The plaintiffs moved for reconsideration as to Counts V and VIII. On July 21, 2015, the district court granted the motion for reconsideration, gave notice that it intended to dismiss Counts V and VIII, and gave the parties time to present argument on the issue.

On August 16, 2015, Officer Perez filed an interlocutory appeal of the district court's July 17, 2015 summary judgment order. On August 21, 2015, the district court entered an amended order on Officer Perez's motion for summary judgment. This time, the district court granted the motion for summary judgment as to the illegal stop excessive force claim, the false imprisonment claim, and the loss of filial consortium claim (Counts I, VI, and VIII) and denied it as to the legal stop excessive force claim, the battery claim, and the intentional infliction of emotional distress claim (Counts II, IV, and V).

As to the excessive force claim, the district court found that a genuine dispute of material fact existed as to whether Gregory moved his hands just before Officer Perez shot him:

> Viewing all of [Gregory's] testimony in a light most favorable to Plaintiffs, a reasonable jury could find that [Gregory] did not move his hands towards the metal bat at the moment of the shooting. Thus, a genuine issue of material fact exists as to the exact placement of [Gregory's] hands at the time Officer Perez fired the initial shot. . . . [I]f a jury finds [Gregory] did not move his hands, it would not have

11

been reasonable for Officer Perez to believe his life was in peril simply by [Gregory] "wobbling" his right leg or rolling onto his left side.

(citation omitted).  The district did not have the televised news broadcast at this point.

The district court concluded that the law is clearly established that "it is a constitutional violation to use deadly force on an armed non-fleeing suspect not posing an immediate threat" and that under Gregory's version of events, Gregory "did not pose an immediate threat to Officer Perez's life."

On September 18, 2015, the plaintiffs filed a cross-appeal, appealing the district court's order granting Miami-Dade's motion to dismiss and the district court's latest, August 21, 2015 amended summary judgment order.

## C.    Second Motion for Summary Judgment and Sebastian Gregory's Death

While the appeal was pending, Officer Perez filed three new motions with the district court: (1) a motion to dismiss the third amended complaint and for reconsideration of the summary judgment order, (2) a motion to certify a substantial issue to this Court, and (3) a motion to file a CD.

While the appeal and Officer Perez's new motions were still pending, Sebastian Gregory passed away on January 16, 2016, after committing suicide. Both this Court and the district court allowed the substitution as plaintiff of Andres Gregory as personal representative of Sebastian Gregory's estate.

12

On May 12 2016, the district court granted Officer Perez's motion to file a CD of the television broadcast, which Officer Perez did.

On August 4, 2016, the district court issued a "second amended order," which, relying on the new evidence of Gregory's television interview contained on the CD, granted Officer Perez's motion for reconsideration and motion for summary judgment on the remaining Counts II, IV, and V of the third amended complaint. The district court thus dismissed the case.

**D.      Conclusion of First Appeal and Final Summary Judgment Order**

On October 5, 2016, this Court found that the district court lacked jurisdiction to enter its August 4, 2016 order granting summary judgment because the cross-appeals were still pending at that time. This Court thus vacated the district court's August 4, 2016 order and remanded the case to the district court so that the district court could reenter its order and judgment in favor of the defendants with jurisdiction.

On October 13, 2016, the district court again entered a "second amended order" that dismissed the plaintiffs' remaining claims and entered a final judgment against the plaintiffs.

As to the movement of Gregory's hands, the district court found that Gregory's "assertion" in the broadcast interview "is in direct contravention of his deposition testimony and evidentiary hearing testimony, and it matches Officer

13

Perez's testimony regarding the moments leading up to the shooting." The district court concluded that, in light of the television interview, there was no longer any genuine dispute of material fact. The district court then found that "it was reasonable for Officer Perez to believe his life was in peril because a jury would find that [Gregory] moved his hands towards his side while laying in the prone position on the ground."

The plaintiffs timely appealed. That most recent October 13, 2016 summary judgment order and the district court's February 13, 2015 amended order granting Miami-Dade's motion to dismiss are the subjects of this appeal.

### III.  § 1983 EXCESSIVE FORCE

Gregory challenges the district court's grant of summary judgment as to his § 1983 excessive force claim in Count II, contending that there is a genuine dispute of material fact as to whether he moved his hands towards the weapon in his hip pocket. We first outline the qualified immunity standard and then address whether there is a genuine dispute of material fact as to whether Officer Perez violated Gregory's clear established Fourth Amendment rights.[6]

---

[6]We review de novo a district court's grant of summary judgment, viewing the facts in the light most favorable to the party opposing the motion. Vinyard v. Wilson, 311 F.3d 1340, 1346 n.7 (11th Cir. 2002).

## A.    Qualified Immunity Doctrine

Qualified immunity protects government officials performing discretionary duties from suits in their individual capacities unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." McCullough v. Antolini, 559 F.3d 1201, 1205 (11th Cir. 2009) (quotation marks omitted).  For qualified immunity to apply, the official asserting the defense must first show that, at the time of the complained of conduct, he was acting within his discretionary authority. McCullough, 559 F.3d at 1205.  Here, there is no dispute that Officer Perez was acting within the scope of his discretionary authority when he stopped Gregory.  The burden then shifts to Gregory to show that Officer Perez is not entitled to qualified immunity.  Id.

To overcome qualified immunity, Gregory must show (1) that Officer Perez violated a constitutional right and (2) that the right was clearly established at the time of the alleged violation.  Id.  Courts have discretion as to which prong of this inquiry to conduct first.  Id.  "Both elements of this test must be satisfied for an official to lose qualified immunity."  Grider v. City of Auburn, Ala., 618 F.3d 1240, 1254 (11th Cir. 2010).  Here, we begin with the first prong.

## B.    Fourth Amendment Violation

A police officer violates the Fourth Amendment right to freedom from unreasonable searches and seizures when the officer uses excessive force.  Vinyard

15

v. Wilson, 311 F.3d 1340, 1347 (11th Cir. 2002). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene" and the inquiry "is an objective one." Graham v. Connor, 490 U.S. 386, 396–97, 109 S. Ct. 1865, 1872 (1989). An officer may only use deadly force against a person whom the officer reasonably perceives as posing an imminent threat of serious physical harm to the officer or others. Robinson v. Arrugueta, 415 F.3d 1252, 1256 (11th Cir. 2005); McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1246 (11th Cir. 2003).

Based on the record before us, we conclude that the district court erred in granting summary judgment on Gregory's excessive force claim. The record demonstrates disputes of material fact that preclude granting summary judgment on that Fourth Amendment claim. See Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

Viewing the facts in the light most favorable to Gregory, a jury issue exists as to whether Gregory moved his hands towards the bulge on his hip and thus posed an immediate risk of serious bodily harm to Officer Perez. There was competing and contradictory testimony about whether Gregory moved his hands, creating a genuine dispute of fact. If Gregory did not move his hands, then Gregory made no threatening moves towards Officer Perez and no reasonable

16

officer could perceive that Gregory posed an immediate risk of serious bodily harm to Officer Perez.  See Mercado v. City of Orlando, 407 F.3d 1152, 1157-58 (11th Cir. 2005) (concluding that a police officer violated the Fourth Amendment when he intentionally shot the plaintiff in the head "especially . . . in light of the fact that [the subject] had not made any threatening moves"); Lundgren v. McDaniel, 814 F.2d 600, 603 (11th Cir. 1987) (finding that a jury could have reasonably believed the officers were never threatened by a weapon and acted without provocation when the officers' claims that the "decedent stood up behind the desk, threatened the officers with a weapon, or fired a shot, were . . . sharply contested").

The other factual disputes, such as whether Officer Perez saw a metallic portion of the bat or which direction Gregory faced on the sidewalk are largely irrelevant to determining whether Gregory posed an immediate risk of serious harm to Officer Perez.  Because Gregory reaching towards the bulge on his hip with his hands is the only fact representing a threatening move, a reasonable jury could conclude that Gregory did not move his hands and that Officer Perez thus violated Gregory's Fourth Amendment rights.

Gregory's televised interview does not eliminate this genuine dispute of material fact.  The portion of the video in which Gregory motions towards his side occurred during a seated interview in a chair and not while Gregory was reenacting how he laid down on the ground.  A reasonable jury could watch that video and

17

determine that Gregory was merely pointing to the location of the bat at the time of the shooting and was not demonstrating that he had actually reached for the bat with his hand.[7] The video is open to interpretation and does not necessarily contradict Gregory's version of events. The ambiguous televised interview is at best impeachment evidence of Gregory's testimony.

The medical examiner's report also does not make Gregory's testimony so unbelievable as to require summary judgment. Notably, the medical examiner's report made no findings about the placement of Gregory's hands other than showing that Gregory was not shot in his arms or hands. The report does make some findings about the positioning of Gregory's body but does so in part based on the disputed testimony of Officer Perez. While the report states that the trajectory of the bullets is consistent with Gregory rolling from side to side, the report neither states that Gregory was rolling from side to side when Officer Perez started firing or claims that Gregory could have not begun rolling as a reaction to Officer Perez shooting him.

This is not a situation where the record contains documentary evidence such as video or photographic evidence of the critical moments—just before Officer Perez began shooting—that so "blatantly contradicted" or "so utterly discredited"

---

[7]We need not decide whether a subsequent declaration by Gregory addressing the televised interview is a sham or inadmissible hearsay because the ambiguity of the broadcast is apparent from watching it, and Gregory's declaration is not necessary to find a genuine dispute of material fact.

Gregory's testimony about the position of his hands such that "no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) (holding that a video recording of the plaintiff recklessly and dangerously driving away from the police in the time just before a police officer rammed the plaintiff's car to end the hot pursuit so blatantly contradicted the plaintiff's version of the facts that the district court should have viewed the facts in the light depicted by the videotape); see also Morton v. Kirkwood, 707 F.3d 1276, 1284-85 (11th Cir. 2013) (explaining Scott as holding that "where an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible" and concluding that forensic evidence that was silent on the key "when" and "how" factual disputes did "not so utterly discredit Morton's testimony that no reasonable jury could believe it" ). The televised interview and forensic evidence do not so blatantly contradict Gregory's testimony as to render it utterly discredited and to preclude the existence of a genuine dispute of material fact.

Because a genuine dispute of material fact exists as to whether Officer Perez's use of force violated Gregory's constitutional rights, we must address the second prong of the qualified immunity analysis, whether Gregory's constitutional rights were clearly established.

19

**C.    Clearly Established Federal Law**

"Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  White v. Pauly, 580 U.S. ___, ___, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting Mullenix v. Luna, 577 U.S. ___, ___, 136 S. Ct. 305, 308 (2015) (per curiam)).  Whether the law is clearly established is not defined "at a high level of generality."  Id. at ___, 137 S. Ct. at 552 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S. Ct. 2074, 2084 (2011)).  Instead, in all but the most obvious cases, "the clearly established law must be 'particularized' to the facts of the case."  Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)).

For that reason, "[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"  Mullenix, 57 U.S. at ___, 136 S. Ct. at 308 (emphasis added) (quoting Reichle v. Howards, 566 U.S. ___, ___, 132 S. Ct. 2088, 2093 (2012)); see also Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012).  In other words, police officers must have "fair and clear warning of what the Constitution requires."  City & Cty. of San Francisco v. Sheehan, 575 U.S. ___, ___, 135 S. Ct. 1765, 1778 (2015) (quoting Ashcroft, 563 U.S. at 746, 131 S. Ct. at 2086–87).

20

When determining whether a particular plaintiff's rights were clearly established, this Court "looks only to binding precedent—cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose—to determine whether the right in question was clearly established at the time of the violation." Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc).  In doing so, we look only at the state of the law on the date of the challenged conduct.  Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002).

The law was clearly established as of May 28, 2012 that shooting a non-resisting suspect who has done nothing threatening and thus posed no immediate danger violates the Fourth Amendment right to be free from the use of excessive force.  See Mercado, 407 F.3d at 1157-58; Lundgren, 814 F.2d at 603; McKinney v. DeKalb Cty., Ga., 997 F.2d 1440, 1443 (11th Cir. 1993) (affirming denial of summary judgment when the disputed facts allowed a jury to conclude that the victim had "put down his knife and was merely shifting position, not threatening the safety of any persons").

This Court's decision in Jean-Baptiste v. Gutierrez, 627 F.3d 816 (11th Cir. 2010), is not, as Officer Perez argues, "on point."  In Jean-Baptiste, an armed individual suspected of committing an armed burglary and robbery fled from police officers and was holding his gun in a situation that reasonably appeared as if

21

he was ambushing a pursuing officer.  Id. at 818-19, 821.  Here, Gregory was not suspected of committing any violent crimes, had not fled from Officer Perez, was not holding anything, had not ambushed Officer Perez, and was lying on the ground.  Instead, Gregory "wobbled."  The situation Officer Perez found himself in was not the sort of fraught, dangerous, escalating situation of a hot pursuit of a fleeing armed suspect found in Jean-Baptiste.[8]  "[T]he mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit.  Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination."  Perez v. Suszczynski, 809 F.3d 1213, 1220 (11th Cir. 2016).

Because the law was clearly established, Officer Perez is not entitled to qualified immunity to Gregory's § 1983 Fourth Amendment excessive force claim in Count II.

---

[8]Similarly, Officer Perez's citation to the dissent in Harrell v. Decatur Cty., Ga., which was later adopted en banc, is not on point although it similarly dealt with whether someone reached for a weapon.  22 F.3d 1570 (11th Cir. 1994), opinion vacated on reh'g, 41 F.3d 1494 (11th Cir. 1995) (en banc) (adopting the reasoning of the dissent).  The Harrell dissent found that based on the evidence there was no contradiction of the officer's testimony that the person's hands were reaching downward as if to grab a weapon.  Id. at 1580 (Dubina, J., dissenting).  Here, Gregory lived and testified that his hands were not moving towards the bulge on his hip.

Other than Jean-Baptiste and Harrell, Officer Perez relies on published opinions from other circuits and non-published opinions from this circuit; neither of which create clearly established law.

22

## IV.    STATE LAW CLAIMS AGAINST OFFICER PEREZ

## A.    Battery and Intentional Infliction of Emotional Distress

Gregory contends that Officer Perez was not entitled to self-defense or sovereign immunity on the battery and intentional infliction of emotional distress claims under state law.[9]

Florida law provides for self-defense immunity to civil claims based on the use of force. Fla. Stat. § 776.032(1) ("A person who uses or threatens to use force as permitted in s. 776.012, s. 776.013, or s. 776.031 is justified in such conduct and is immune from criminal prosecution and civil action for the use or threatened use of such force."). Florida law limits the justifiable use of deadly force to situations where the person "reasonably believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony." Fla. Stat. § 776.012(2). The analysis for Florida self-defense immunity tracks the analysis under § 1983. See Penley v. Eslinger, 605 F.3d 843, 855 (11th Cir. 2010) (applying the § 1983 objective reasonableness analysis to § 776.012).

Thus, as previously discussed, because there remains a jury issue as to whether Gregory made a threatening move and as to whether Officer Perez reasonably believed the use of deadly force was necessary, self-defense immunity

---

[9]Gregory does not challenge the grant of summary judgment dismissing his false imprisonment claim.

23

does not apply, and summary judgment was not appropriate on Gregory's state law battery claim.

Officer Perez also contends that he should be protected from all of Gregory's state law claims by sovereign immunity. Florida law shields officers from personal tort liability while acting in their scope of employment unless the officer "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a). Officer Perez argues that his testimony that he acted not with bad faith but based on a genuine belief that Gregory was going to attack him is unrebutted. If a jury, however, believes Gregory's testimony that he only "wobbled" his leg and did not reach towards the bulge on his hip, then the jury could also conclude that no objectively reasonable officer would have used excessive force and that Officer Perez acted with a wanton and willful disregard for Gregory's safety.

The district court only found that self-defense and sovereign immunity applied because there was no genuine dispute about the placement of Gregory's hands. Because that fact is genuinely disputed, the district court erred in finding Officer Perez was entitled to either immunity as to Gregory's state law battery and intentional infliction of emotional distress claims in Counts IV and V.

24

**B.    Parents' Loss of Filial Consortium Claim**

The district court granted summary judgment on Gregory's parent's loss of filial consortium claim against Officer Perez (Count VIII), first based on self-defense and sovereign immunity, second because Gregory's claims did not sound in negligence, and third because there was no evidence of loss to the parents. As explained above, self-defense and sovereign immunity do not attach here as to Officer Perez.

A Florida statute provides for a cause of action by a dependent whose parent suffers "a permanent total disability" "through negligence," as follows:

> A person who, through negligence, causes significant permanent injury to the natural or adoptive parent of an unmarried dependent resulting in a permanent total disability shall be liable to the dependent for damages, including damages for permanent loss of services, comfort, companionship, and society. This section shall apply to acts of negligence occurring on or after October 1, 1988.

Fla. Stat. § 768.0415 (emphasis added).

The Florida Supreme Court has held that the Florida common law includes a corollary cause of action for loss of filial consortium by parents "to allow recovery for the loss of a negligently injured child's companionship." United States v. Dempsey, 635 So. 2d 961, 964 (Fla. 1994). The Florida Supreme Court explained "that recovery for loss of filial consortium should be limited in the same manner in which recovery for the loss of parental consortium has been limited by the

25

legislature," in that the recovery is limited "to those losses caused by a significant injury 'resulting in a permanent total disability.'" Id. at 965 (quoting Fla. Stat. § 768.0415).   The Florida Supreme Court in Dempsey thus concluded: "Accordingly, we hold that a parent of a negligently injured child has a right to recover for the permanent loss of filial consortium suffered as a result of a significant injury resulting in the child's permanent total disability." Id. (emphasis added).   Section 768.0415 covers "negligent act[s]," which is "an act that creates an unreasonable risk of harm to another." Honeywell Int'l, Inc. v. Guilder, 23 So. 3d 867, 870 (Fla. Dist. Ct. App. 2009) (internal quotation marks omitted).

Addressing the loss of filial consortium claim against Officer Perez, the district court found that there was "no record evidence to support a finding that [Gregory] was negligently injured as required by Fla. Stat. § 768.0415."  The district court reasoned that § 768.0415 only covers injuries resulting from negligent acts and that the same limitation should be applied to a common law claim under Dempsey.  Next, the district court concluded that Gregory's "overall theory of liability" did not sound in negligence because (1) the plaintiffs claimed purposeful action by Officer Perez; (2) Officer Perez testified that he intentionally discharged his weapon; and (3) it was "difficult to envision the circumstances under which one could negligently discharge a firearm nine (9) times."

26

Gregory contends that "the conduct at issue in this case clearly fits within" the definition of negligent acts in <u>Honeywell</u>. We agree, however, with the well-reasoned opinion of the district court. In <u>Dempsey</u>, the Florida Supreme Court made clear that the common law cause of action asserted by Gregory's parents here is limited to negligently injured children. The facts and claims here do not sound in negligence. Officer Perez intentionally pulled the trigger nine times. Gregory's other claims are not based in negligence but include <u>intentional</u> infliction of emotional distress, battery—an intentional tort claim—, and the use of excessive force. <u>See</u> <u>City of Miami v. Sanders</u>, 672 So. 2d 46, 48 (Fla. Dist. Ct. App. 1996) ("[I]t is not possible to have a cause of action for 'negligent' use of excessive force because there is no such thing as the 'negligent' commission of an 'intentional' tort."); <u>see also</u> <u>Essex Ins. Co. v. Big Top of Tampa, Inc.</u>, 53 So. 3d 1220, 1223 (Fla. Dist. Ct. App. 2011) (explaining that a claim of excessive force by a police officer is a claim of battery).

Because this is not a case of negligent injury, the district court correctly granted summary judgment on the filial consortium claim against Officer Perez in Count VIII, and we need not address whether the record contains evidence of loss to the parents.[10]

---

[10] Count VIII in the third amended complaint was originally brought against both Officer Perez and the County. However, on appeal, Gregory's brief argues that summary judgment should not have been granted in favor of Officer Perez on Count VIII, and that the district court

27

Finally, we recognize that the dissent argues that the term "negligence" in the statute should be read to include intentional acts such as a shooting, because a shooting "create[s] an unreasonable risk of harm" to another. We must disagree. First, the plain language of § 768.0415 covers only injury "through negligence" and "acts of negligence." Second, the Florida legislature knows how to allow recovery for injury from both negligence and intentional torts, but it did not do so in § 768.0415. Compare Fla. Stat. § 768.28(1) (waiving sovereign immunity in actions to recover "for injury or loss of property, personal injury, or death caused by the negligent or wrongful act or omission" of any state or municipal employee acting within the scope of employment) (emphasis added); Fla. Stat. § 827.03 ("A person who willfully or by culpable negligence neglects a child and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to the child commits a felony of the second degree.") (emphasis added); Fla. Stat. § 588.15 ("Every owner of livestock who intentionally, willfully, carelessly, or negligently suffers or permits such livestock to run at large or stray upon the public roads of this state shall be liable in damages for all injury and property damage sustained by any person by reason thereof.") (emphasis added). Here, we apply the

---

erred in its statutory interpretation of § 768.0415 as being limited to negligence. But Gregory does not argue that the loss of consortium claim in Count VIII otherwise should proceed against the County.

language of the statute as written, but note that the incongruity, aptly pointed out by the dissent, arguably calls for a legislative solution.

## V.    CLAIMS AGAINST MIAMI-DADE COUNTY

Gregory and his parents brought state law claims against Miami-Dade County for battery (Count III), false imprisonment (Count VII), and loss of filial consortium (Count VIII).  The district court dismissed those claims based on sovereign immunity because the alleged facts showed that Officer Perez acted in bad faith, with malice, or with willful and wanton disregard for human safety.[11]

In the battery and false imprisonment counts against Miami-Dade, the operative complaint alleges that Officer Perez "overreacted," and that Gregory "posed no threat to Officer Perez at the time he was shot in the back multiple times, nor was he resisting Officer Perez in an way."  Counts III and VII go further and allege that no amount of force was justified, stating:

> At the time [Gregory] was repeatedly shot in the back by Officer Perez, [Gregory] was not committing a crime and had not threatened Officer Perez.  [Gregory] did not engage in any conduct at the time he was shot that justified Officer Perez's use of any amount of force upon him – let alone the use of deadly force.[12]

---

[11]We review de novo a district court's order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1347 (11th Cir. 2016).

[12]Counts III and VII of the operative complaint expressly incorporate the allegations in paragraphs 9-12 quoted above.

Gregory contends that, based on this alternative pleading, sovereign immunity does not attach, because there is no allegation of bad faith, malice, or wanton and willful disregard of Gregory's rights and safety by Officer Perez.  In response, the defendants walk a fine line, arguing on one hand that Officer Perez is entitled to sovereign immunity "because he did not act maliciously, in bad faith, or with wanton and willful disregard for Gregory's rights," but arguing on the other hand that the facts alleged in the complaint "could only be characterized as acts done in bad faith or in a wanton and willful manner."

The relevant sovereign immunity statute here is Fla. Stat. § 768.28(9)(a), which provides in relevant part:

> The state or its subdivisions shall not be liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of her or his employment <u>or committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property</u>.

Fla. Stat. § 768.28(9)(a) (emphasis added).

Florida law thus "provides that the State and its subdivisions 'shall not be liable in tort for the acts or omissions of an officer, employee, or agent . . . committed . . . in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313, 1330 (11th Cir. 2015) (quoting Fla. Stat. § 768.28(9)(a)).  Florida sovereign immunity does not bar all suits based on excessive force or battery by a police

officer because those intentional torts "do not inherently or necessarily involve those elements[—bad faith, malicious purpose, or wanton and willful disregard of human rights—]which would activate immunity." Richardson v. City of Pompano Beach, 511 So. 2d 1121, 1124 (Fla. Dist. Ct. App. 1987). As explained by another Florida appellate court addressing battery claims against a city for an officer's use of excessive force: "While battery is an intentional tort, the City may be held liable for an employee's intentional act(s) as long as the employee is acting within the course and scope of his employment and the act or omission is not committed in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of the plaintiff's rights." City of Boynton Beach v. Weiss, 120 So. 3d 606, 611 (Fla. Dist. Ct. App. 2013); see McGhee v. Volusia Cnty., 679 So. 2d 729 (Fla. 1996) (rejecting the argument that a police officer who lunged at a defendant in custody, grabbed him by the throat, and kicked him was, as a matter of law, acting outside the scope of his employment or in a willful and wanton manner); Carestio v. Sch. Bd. of Broward Cnty., 866 So. 2d 754 (Fla. Dist. Ct. App. 2004) (concluding that school employees who kicked and punched a student after removing him from class for disruptive behavior were within the scope of employment, and directing the factfinder the determine whether the employees were acting in a willful and wanton manner).

31

The question here is thus whether the facts alleged in the complaint plausibly state a claim that Officer Perez committed an intentional and wholly unjustified battery against Gregory but did not do so "in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of the plaintiff's rights." In other words, plaintiffs may use alternative pleading to bring suit against both a government entity and an individual employee, but, if the factual allegations can occur only from bad faith or malicious or wanton and willful conduct, then the claim against the government entity fails under § 768.28.

Accepting as true the facts alleged in the complaint, Officer Perez shot a 16-year-old six times in the back. Gregory's complaint pled that he had not committed a crime, had not resisted Officer Perez, and had not threatened Officer Perez. Notably, Gregory also pled that he did not engage in any conduct that "justified Officer Perez's use of any amount of force upon him – let alone the use of deadly force." This case involves not just any battery—such as punching, kicking, or beating—but an egregious, aggravated battery of repeatedly shooting Gregory with a firearm in the back. Under Gregory's pled facts, there is not even a pretense of a lawful right to shoot Gregory in the performance of Officer Perez's duties. See McGhee, 679 So. 2d at 733 (stating that the employing agency is immune "if there is not even a pretense of lawful right in the performance of the acts"). It would be implausible to find that Officer Perez acted without wanton and

32

willful disregard of Gregory's rights or to conclude that Officer Perez merely made an honest mistake when he pulled the trigger nine times.

At bottom, we agree with the district court that "the allegations incorporated against the County connote conduct much more reprehensible and unacceptable than mere intentional conduct and can only be characterized as stating claims for acts done in bad faith or in a willful and wanton manner." We are not saying that plaintiffs cannot plead in the alternative in these types of case, but rather that no version of the facts pled in this particular case support a claim that Officer Perez acted without wanton and willful disregard of Gregory's rights. Sovereign immunity therefore attaches to the claims against Miami-Dade. The district court correctly dismissed the state law claims in Counts III, VII, and VIII against Miami-Dade.

## VI.   CONCLUSION

Based on the foregoing reasons, we affirm the district court's grant of Miami-Dade's motion to dismiss and the district court's grant of summary judgment to Officer Perez on the loss of filial consortium claim. We reverse the district court's dismissal of the § 1983 excessive force, battery, and intentional infliction of emotional distress claims against Officer Perez. We remand the case to the district court for a trial on the remaining claims.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

33

JORDAN, Circuit Judge, concurring in part and dissenting in part:

I fully concur in the majority opinion concerning the claims against Officer Perez. But I disagree, and therefore dissent, with respect to the dismissal of the state-law claims against the County.

In my view, Mr. Gregory properly and sufficiently pled that Officer Perez acted negligently, although he alternatively alleged that he acted with bad faith and malicious purpose. *See* Fed. R. Civ. P. 8(d)(2). Because "it is possible for a law enforcement officer to commit an illegal act in the course of his or her employment while acting in good faith," *Keating v. City of Miami*, 598 F. Supp. 2d 1315, 1341 (S.D. Fla. 2009), and because generally a jury must decide "whether the deputy acted in bad faith, with malicious purpose, or in a manner exhibiting wanton or willful disregard of human rights, safety, or property," *Carestio v. School Bd. of Broward Cty.*, 866 So. 2d 754, 756 (Fla. 4th DCA 2004) (citing and relying on *McGhee v. Volusia Cty.*, 679 So. 2d 729, 733 (Fla. 1996)), I think the district court erred in dismissing Mr. Gregory's state-law claims against the County pursuant to Fla. Stat. § 768.28(9)(a).

The district court dismissed Mr. Gregory's claims against the County because it found that "the allegations incorporated against the County connote conduct much more reprehensible and unacceptable than mere intentional conduct and can only be characterized as stating claims for acts done in bad faith or in a

34

willful and wanton manner." D.E. 112 at 5 (citing *Richardson v. City of Pompano Beach*, 511 So. 2d 1121, 1123 (Fla. 4th DCA 1987)). I believe the district court was mistaken. Even though it purported to be "considering the totality of the circumstances," *id.*, the only factor that the district court actually considered was that "Officer Perez's overreaction led him to fire nine (9) shots into Sebastian's back." *Id.* at 6. Indeed, that was the only factor that the court *could* consider, because it was all that Mr. Gregory alleged in the "Facts Giving Rise To Claims" section of his third amended complaint (the only section applicable to both Officer Perez and the County). Mr. Gregory did not allege bad faith; he did not allege malicious purpose; and he did not allege willful or wanton disregard of human rights, safety, or property. He simply alleged that Sebastian "posed no threat to Officer Perez at the time he was shot in the back multiple times, nor was he resisting Officer Perez in any way." D.E. 60 at ¶¶ 7-9.

Nor did Mr. Gregory allege anything remotely akin to bad faith, malice, or willful or wanton disregard in the state-law claims against the County (Counts III and VII). He simply alleged that Officer Perez "used force that was excessive and unreasonable under the circumstances," *id.* at ¶¶ 35, 56, and that Officer Perez's conduct was "unreasonable and unwarranted under the circumstances." *Id.* at ¶ 57. As an aside, there can be no doubt that Mr. Gregory did not intend to allege bad faith in the claims against the County, because he explicitly alleged bad faith in the

35

state-law claims against Officer Perez (Counts IV, V, and VI). *See id.* at ¶¶ 40-42, 47, 53 (alleging that Officer Perez "did intentionally cause harm to Sebastian," "did intentionally desire to cause Sebastian to fear physical harm," and "acted in bad faith, with malicious purpose, and in a manner exhibiting wanton and willful disregard of Sebastian's rights, safety, or property").

Florida courts have consistently denied motions to dismiss under similar and even more egregious circumstances, often explicitly allowing for the very "pleading in the alternative" that Mr. Gregory here seeks to validate. As an example, in the very case cited by the district court, the Fourth District reversed the dismissal of claims against a municipality because, although the actions of the police officer in effecting the alleged excessive force and unlawful arrest were intentional, they were not "much more reprehensible and unacceptable than mere intentional conduct." *Richardson*, 511 So. 2d at 1123.

*Richardson*, moreover, is not an outlier, for the Florida Supreme Court has stated that an agency "is immune as a matter of law only if the acts are *so extreme* as to constitute *a clearly unlawful usurpation of authority* the deputy does not rightfully possess, or if there is *not even a pretense of lawful right* in the performance of the acts." *McGhee*, 679 So. 2d at 733 (emphasis added) (internal citations omitted) ("The fact that [the deputy] may have intentionally abused his office does not in itself shield [the county] from liability."). Indeed, in *McGhee* the

36

Florida Supreme Court reversed the dismissal of claims against a county even though the deputy allegedly "lunged at McGhee, grabbed him by the throat, and began kicking McGhee with force" while he was handcuffed. *Id*. at 730. *See also Carestio*, 866 So. 2d at 756-57 (relying on *McGhee*, reversing the grant of *summary judgment* to a school board even though the individual employees allegedly physically assaulted a minor child by kicking and punching him in the head and body, and rejecting the argument that such knowing, intentional behavior qualified as bad faith, malice, or willful and wanton disregard as a matter of law); *Baldwin v. City of Fort Lauderdale*, 961 So. 2d 1015, 1015-16 (Fla. 4th DCA 2007) (reversing grant of summary judgment for the city despite allegations that the police officers had severely beaten the plaintiff after he was arrested and handcuffed).

The majority correctly states that the dispositive issue is whether the facts alleged could constitute "an intentional and wholly unjustified battery . . . but not [one done] in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of the plaintiff's rights." Maj. Op. at 33. I disagree, however, with the majority's conclusion that the answer must be, as a matter of law, no. For example, in *Hennagan v. Dept. of Highway Safety and Motor Vehicles*, 467 So. 2d 748 (Fla. 1st DCA 1985), the municipality was not shielded from liability as a matter of law even though the allegations included that the police officer falsely

37

arrested a minor in order to facilitate a sexual abuse of that minor. *See id.* at 751 (holding "it is not impossible to attribute the alleged actions of Trooper Jones, at least in part, to misfeasance and/or overzealousness in the performance of his official duties"). And in *Keating v. City of Miami*, 598 F. Supp. 2d 1315 (S.D. Fla. 2009), and *Rauen v. City of Miami*, 2007 WL 686609 (S.D. Fla. Mar. 2, 2007), which arose from the same set of predicate facts and events, the respective district courts denied motions to dismiss despite allegations that the police officers dispersed lawful assemblies by using "brutal physical force, including a wide array of munitions as well as the release of chemical toxins, against peaceful demonstrators," and "opened fire on the demonstrators with tear gas, pepper-spray, shotgun-based projectiles [and] beanbags." *Keating*, 598 F. Supp. 2d at 1323. *See id.* at 1341 ("The Court does find that the conduct alleged in this case could be viewed as rising to the level of wanton and willful conduct; however, Plaintiffs are entitled to plead in the alternative, and this claim is not precluded.").

These Florida cases illustrate the principle that intentional acts, illegal acts, intentionally illegal acts, and perhaps even criminal acts can be committed by police officers without imputation of bad faith or malice as a matter of law. When compared to these cases, the analysis here is not difficult. Officer Perez acted in an instant, and not over a sustained period of time. His actions could be found to constitute negligent acts or "illegal act[s] . . . taken in good faith," *Keating*, 598 F.

38

Supp. 2d at 1341, and do not necessarily require any imputation of bad faith or personal ill-will.

The district court also erred by applying the wrong standard for "willful and wanton" behavior. It cited to the dissent in *Lemay v. Kondrk*, 860 So. 2d 1022, 1025 (Fla. 5th DCA 2003) (Orfinger, J., dissenting), for the proposition that "it must be shown that the defendant knew, or reasonably should have known in light of the surrounding circumstances, that his conduct would naturally or probably result in injury and, with such knowledge, disregarded the foreseeable injurious consequences." D.E. 112 at 6. But a close reading of *Lemay* reveals that this definition was used to describe willful and wanton *negligent* behavior, not *intentional* behavior. *Lemay*, 860 So. 2d at 1025 ("Wanton conduct, or willful and wanton conduct, have been described as lying somewhere between ordinary negligence and intentional conduct. Willful and wanton conduct is generally something more than ordinary negligence but less than deliberate conduct.") (internal citations omitted). In the context of § 768.28(9)(a), "willful and wanton" requires actions *more egregious* than intentional behavior ("much more reprehensible and unacceptable than mere intentional conduct"). *Richardson*, 511 So. 2d at 1123. But the dissenting judge's definition in *Lemay* addressed behavior *less egregious* than intentional conduct (describing "various grades of negligence"

39

and emphasizing that "wanton and willful disregard" required actions more grievous than mere negligence).

I would reverse the dismissal of the state-law claims against the County.

GILMAN, Circuit Judge, concurring in part and dissenting in part:

I fully concur in all parts of the majority opinion's decision other than its denial of the loss-of-filial-consortium claim. With regard to that claim, I respectfully dissent.

As the majority notes, the Florida Supreme Court has held that the common law "allow[s] recovery for the loss of a negligently injured child's companionship." *United States v. Dempsey*, 635 So. 2d 961, 964 (Fla. 1994). And *Dempsey* further held that "recovery for loss of filial consortium should be limited in the same manner in which recovery for the loss of parental consortium has been limited by the legislature"—to "those losses caused by a significant injury 'resulting in a permanent total disability.'" *Id.* at 965 (quoting Fla. Stat. § 768.0415).

After reviewing the loss-of-parental-consortium statute's legislative history, the District Court of Appeal of Florida in *Honeywell International, Inc. v. Guilder*, 23 So. 3d 867, 870 (Fla. Dist. Ct. App. 2009), concluded that negligence is "capable of multiple meanings" and explicitly defined the term "negligent act" for purposes of the statute as "*an act that creates an unreasonable risk of harm to another.*" *Id.* (citing *Black's Law Dictionary* 28 (9th ed. 2009)) (emphasis added).

There is no doubt that, if the facts are viewed in the light most favorable to Sebastian's parents, Perez's conduct falls within that definition. According to the

41

parents, Perez fired nine shots at Sebastian in the absence of a reasonable fear of physical harm to Perez or others. Such an action would undoubtedly "create an unreasonable risk of harm to" Sebastian. *See id.* Neither the district court nor the majority cites any case to support a conclusion that an intentional act such as a shooting cannot support a loss-of-filial-consortium claim pursuant to Florida law. That the parents' claims are not based on a theory of negligence is therefore not determinative.

Moreover, limiting loss-of-filial-consortium claims to losses resulting from unintentional acts would create an absurd result. Parents would be able to seek relief from an individual who carelessly but unintentionally injured their child, while an individual who intentionally injured their child would be shielded from any liability for loss of the child's companionship. Florida courts presumably support a more logical interpretation of loss-of-consortium claims—that relief through such claims is available wherever a child or parent is injured by "an act that creates an unreasonable risk of harm to another." *See Honeywell*, 23 So. 3d at 870. This expansive definition of "negligence" for the purposes of a filial-consortium claim is the only one that makes sense.

The district court also based its summary-judgment ruling regarding the loss-of-filial-consortium claim on a finding that the parents had failed to "come forward with any evidence detailing how they 'have been deprived of the value of

Sebastian's ordinary day-to-day services as well as the loss of companionship, society, love, affection, and solace' or how they 'will continue to be so deprived in the future.'"  But the district court did not cite any authority to support a requirement that a parent must "detail" such deprivation.  Rather, the Supreme Court of Florida has noted that these elements of consortium, excluding the loss of services, are "intangible."  *Dempsey*, 635 So. 2d at 965.

*Dempsey* recognized that permanent injury to a child can affect the child-parent relationship, indicating that parents need only show that their minor child has been permanently injured through negligent conduct (as expansively defined in *Honeywell*) in order to prove a claim for loss of filial consortium.  *Id.* at 964–65. Sebastian's parents allege in their complaint that their son was permanently injured as a result of Perez shooting him.  His continuing pain was apparently a factor that eventually led to Sebastian's suicide in January 2016.  Sebastian's parents have thus provided evidence that, if believed by the jury, establishes a claim for loss of filial consortium.

With regard to loss of services, *Dempsey* explained:

To recover for loss of services as part of the consortium interest, no showing of extraordinary abilities is necessary. Loss of services in this context necessarily will be interwoven with the more intangible aspects of the parent's consortium interest. In contrast, in order for a parent to recover a separate award for the loss of a permanently disabled child's services above that recoverable as a general component of loss of filial consortium, the parent must establish that

43

the child had extraordinary income-producing abilities prior to the injury.

635 So. 2d at 965.

Ordinary day-to-day services are thus considered to be part of the consortium interest. *Id.* So despite no allegation of additional or separate loss of services, the district court erred when it found that summary judgment was warranted because Sebastian's parents had failed to detail their loss of consortium and day-to-day services. I would therefore reverse the district court's grant of summary judgment in favor of Perez on this claim and allow it to proceed along with the other claims being remanded for trial.